FILED IN THE
UNITED STATES
BANKRUPTCY COURT

2013 JUN -7 A 9:06

DISTRICT OF UTAH
MAIL

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re | |
| KATIE LYNN BIRCHARD, | CASE NO.: 12-30265-WTT |
| Debtor, | **DECLARATION OF PLAINTIFF TRACY R. TERHUNE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DETERMINE DISCHARGEABILITY OF DEBT** |
| ************************************ | |
| Tracy R. Terhune, | |
| Plaintiff. | (Chapter 7) |
| v. | |
| Katie Lynn Birchard, | |
| Defendant | |
| | Adversary Proceeding No. 12-02552 |

//
//
//
//



- 1 -

# DECLARATION

I, Tracy R. Terhune, declare:

1. I am the Plaintiff in the above-captioned matter. I have personal knowledge of the facts contained in this declaration, and if I were called upon to testify I could and would testify competently as to the truth of the facts stated herein.

2. I am an author on silent films pertaining to the silent film actor Rudolph Valentino and published a book in 2004 entitled "Valentino Forever" and in 2006, re-published a book entitled "Valentino the Unforgotten".

3. In or around October of 2009, Defendant owned and/or operated the following internet websites: www.halapickford.com; www.rudolphvalentino.org; www.therudolphvalentinofilmfestival.com; www.forgetthetalkies.com; www.perpetualflapper.blogspot.com

4. In or around October of 2009, Defendant began publishing derogatory statements and accusations about me on her websites, depicting me as mentally ill, sinister, insane and fraudulent, even though Defendant had never personally met me.

5. The false and defamatory statements communicated by Defendant were published and disseminated on the world-wide web. At times, Defendant used the alias name "Hala Pickford" to publish her statements.

6. Defendant has repetitively portrayed me as mentally unstable, dangerous, and as someone who engaged in illegal activity. For example, Defendant published a post on one of her websites, via the World Wide Web, stating that "No links to Donna Hill or the King of Kooky aka Tracy Terhune [Plaintiff]. The dynamic duo have used illegal means in the past and we want no part of it. They have a history of bullying and ripping off fans, and that will just not fly here."

7.    Among other remarks and comments intended to falsely depict me as mentally unstable, Defendant posted on one of her websites, that "Tracy Terhune [Plaintiff] is obsessed with Rudy's death, he profits off of it, he's insane, vindictive, and childish.", and on another occasion referred to me as "Evil Terhune."

8.    Furthermore, Defendant has repetitively referred to me using the derogatory title of "King Kooky," and published numerous false allegations about my sanity and/or mental well-being.  For example, Defendant published a post on one of her websites, via the World Wide Web, stating "…But King Kooky and self-proclaimed Valentino 'authority' Tracy Terhune [Plaintiff] is at it again, and it just needs to end. You guys would not believe how dangerous and looney someone [Plaintiff] like this is…"

9.    Defendant has fabricated stories, and posted them via the World Wide Web, that I stalk and publicly harass her.  For example, Defendant published a post on one of her websites, via the World Wide Web, making the false allegation that "I refuse to publicly get into a pissing match with those types anymore; no matter how dangerous or off kilter they [Plaintiff] are (including stalking me to public events where they [Plaintiff] know I am)."

10.    Defendant further posted "Once I have my restraining order I will feel better.  Terhune has an obsessive screw loose especially when it comes to stalking people in public" and also posted "I'm sure Terhune's continual harassment of me will someday come out."

11.    Defendant further posted that "Terhune had David Bret send me death threats so I would miss the case and lose" and, when referring to David Bret and Tracy Terhune, also posted "yes…they've sent me the death threats and harassed me".  None of these statements are true.

- 3 -

12.  Defendant also falsely claimed that I started harassing her family "telling people to send them bombs or something to explode in the mail" and that I said that the Defendant needs to be "done away with" and that "The Valentino Mafia (Tracy Terhune, Bob Birchard, and Stella Grace) have also harassed their fair share of people before...but those people are too terrified of another occurrence and have sworn me to secrecy on it." I have never made such remarks or threats whatsoever.

13.  Defendant also falsely claimed she had a restraining order against me when she posted on one of her internet blogs "Despite my attempts to get anyone to listen to me that Tracy Terhune was violating his restraining order...no one would listen to me. And I'm mad as hell about it."

14.  Defendant further falsely claimed that I sabotaged a film festival she arranged. She posted "I was working hard to make The Rudolph Valentino Film Festival come true and it appeared it would: I had a theatre and a sponsor. Terhune and his cronies took that away..."

15.  The truth of the matter was that Defendant did not have sufficient funding for the Rudolph Valentino Film Festival event. Margot Gerber, of the American Cinematheque at the Egyptian & Aero Theatres, indicated in an e-mail message to a friend, Robert Birchard, that "I don't know Tracy at all. I met with Hala and spoke to her several times on the phone. It became clear to me that she did not have the funding to put on the ambitious event she was proposing so I wished her luck and told her I wasn't going to take it further with the Cinematheque."

16.  Defendant also contacted relatives of my friend, Jeanine Villalobos, to warn them about me. Jeanine wrote to me in an e-mail message that Hala Pickford "contacted my Aunt Sylvia to warn her about you (!), among other things..."

- 4 -

17. Despite my attempt to resolve this matter legally and amicably, in response to my repeated requests to Defendant to remove the false and defamatory statements, Defendant chose to instead mock me when she posted the following on one of her websites: "I got a HILARIOUS legal letter from Tracy Terhune [Plaintiff], King of Kookies today (my favorite line had to be about 'hindering his ability for future publishing contracts'".

18. Defendant further posted via her website that "He's [Plaintiff] not gonna blackmail or harass me and get away with it just so he can try and keep his fake halo atop his head. Why does he [Plaintiff] want this stuff down? Because it warns people about what a whacked out asshole he [Plaintiff] is." And she also posted: "Tracy, King Kooky, its already personal".

19. Defendant also claimed that I was "cracked out" on drugs.

20. I am not mentally ill or unstable.

21. I do not have any criminal history or record.

22. I have never engaged in any illegal or fraudulent activities whatsoever.

23. I believe there is no doubt that Defendant's actions were personal and deliberate. For example, as stated in one of her postings "Tracy [Plaintiff], King Kooky, its already personal."

24. I believe that the Defendant's acts were willful in that Defendant intended to harm me and inflict damage on my reputation and standing in the community and were malicious in that they were wrong, unjustified and totally without any basis.

25. Attached hereto as Exhibit 1 is a true and correct copy of Defendant's Answer to Plaintiff's Complaint to Determine Dischargeability of Debt filed December 27, 2012.

26. Attached hereto as Exhibit 2 is a true and correct copy of the Transcript of Civil Harassment Proceedings conducted on April 12, 2012 in Defendant's Civil Harassment claim against me.

27. Attached hereto as Exhibit 3 are true and correct copies of screen shots of most of the derogatory statements and accusations posted by Defendant against me on Defendant's various web sites. However, not all of Defendant's web sites, are now currently operational.

28. Attached hereto as Exhibit 4 is a true and correct copy of my Complaint against Defendant, filed in the Los Angeles Superior Court on March 19, 2010.

29. Attached hereto as Exhibit 5 is a true and correct copy of the Judgment entered against Defendant on September 17, 2010 and based on my Los Angeles Superior Court Complaint.

30. Attached hereto as Exhibit 6 is a true and correct copy of the Abstract of Judgment issued against Defendant on March 25, 2011 by the Los Angeles Superior Court.

31. Attached hereto as Exhibit 7 is a true and correct copy of the Writ of Execution issued March 25, 2011 against Defendant by the Los Angeles Superior Court.

32. Attached hereto as Exhibit 8 is a true and correct copy of the Bench Warrant issued against Defendant on July 25, 2011 by the Los Angeles Superior Court.

33. Attached hereto as Exhibit 9 is a true and correct copy of an e-mail messages from Ms. Margot Gerber.

34. Attached hereto as Exhibit 10 is a true and correct copy of an e-mail message from Ms. Jeanine Villalobos.

//

//

- 6 -

1    I declare under penalty of perjury under the laws of the State of California, State of Utah, and

2    the laws of the United States of America that the foregoing is true and correct.

3

4    Date: 6/6/2013

5                                                        Plaintiff, Tracy R. Terhune
6                                                        11230 Peachgrove Street, #209
                                                         North Hollywood, California 91601
7                                                        (818) 777-6622

**DECLARATION OF TRACY R. TERHUNE IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | | |
|---|---|---|
| In re **Katie Lynn Birchard** , ) | Case No. **12-30265-WTT** |
| Debtor ) | |
| **Tracy R. Terhune** ) | Chapter  **7** |
| Plaintiff ) | |
| ) | |
| v. ) | Adv. Proc. No.  **12-02552** |
| **Katie Lynn Birchard** ) | |
| Defendant ) | |

## ANSWER TO PLAINTIFF'S COMPLAINT TO

## DETERMINE DISCHARGEABILITY OF DEBT

COMES NOW Bryan T. Adamson, who does now enter his appearance of counsel for the Defendant, Katie Lynn Birchard in this adversary proceeding filed by the Plaintiff on November 27, 2012. Defendant, through counsel, does hereby answer Plaintiff's Complaint to Determine Dischargeability of Debt.

### JURISDICTION AND VENUE

1.      Paragraph 1 is admitted.

2.      Paragraph 2 is admitted.

3.      Paragraph 3 is admitted.

4.      Paragraph 4 is admitted.

### PARTIES

5.      Paragraph 5 is admitted.

6.      Paragraph 6 is admitted.

### BACKGROUND AND FACTS

7.      Paragraph 7 is admitted.

8.      Paragraphs 8 through 18 are denied.

9.      Paragraph 19 is admitted only as far as an attorney was hired by the Plaintiff and that a Civil Complaint for Damages and Injunctive Declaratory Relief was filed on March 19, 2010.  All other portions of the paragraph are denied.

10.     Paragraph 20 is admitted.  However, at the hearing on September 17, 2010, Defendant was unable to appear as she had just been released from the hospital that day after being admitted with moderate

bronchitis.  Defendant's Motion to Set Aside Default was denied and she was not able to set forth her

defense against the allegations in the original complaint.

11.    Paragraphs 21 and 22 are admitted.  There is a judgment entered as Plaintiff states.

12.    Paragraph 23 is denied for lack of knowledge.

13.    Paragraph 24 is denied.  Defendant denies all allegations set forth by the Plaintiff in the original Civil

Complaint for Damages and Injunctive Declaratory Relief.

14.    Paragraph 25 is admitted as an oversight by the document preparer.  This schedule can be amended by

counsel at this Honorable Court's request.

## COUNT 1

### NON-DISCHAREABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)

15.    In regards to Plaintiff's second paragraph 21, the Defendant reaffirms her admittance and denials as

previously set forth, as they apply to each of the Plaintiff's incorporated paragraphs 1 through 25 as

stated.

16.    Plaintiff's second paragraph 22 is denied.  Defendant asserts that no such claim can exist when she

denies the allegations set forth in the original complaint filed in 2010.

17.    Plaintiff's second paragraph 23 is admitted.  11 U.S.C. § 523(a)(6) does indeed stated that debts "for

willful and malicious injury by the debtor to another entity or to the property of another entity" are

nondischargable.  However, there is no finding by the trial court that the acts were done willfully or

maliciously, therefore 11 U.S.C. § 523(a)(6) does not apply in this case as the Defendant denies the

allegations set forth in the original complaint filed in 2010.

18.    Plaintiff's second paragraph 24 is denied.  Defendant denies that she has any responsibility for the

Plaintiff's emotional, professional, and social standings as the Defendant denies the allegations set

forth in the original complaint filed in 2010.  Further, Defendant believes that the legal fees and costs

referenced to by the Plaintiff in this matter are unjustly deserved as she was unable to set forth her

defense against the allegations set forth in the original complaint.

Wherefore, the Defendant respectfully requests that this Honorable Court:

1.    Require the Plaintiff to provide the evidence required by the burden of proof to the allegations of

defamation alluded to in this adversary proceeding;

2.  If the burden of proof is not met by the Plaintiff, that the judgment awarded by the Superior Court of

the State of California, County of Los Angeles, North Central District to the Plaintiff in the amount of

$100,526.55 be discharged through the Defendant's Chapter 7 bankruptcy;

3.  The awarding of attorney's fees and costs;

4.  The awarding of any other punitive damages as this Honorable Court deems appropriate; and

5.  An injunction be put in place to prevent the Plaintiff and any party representing the Plaintiff from

further defamation and harassment of the Defendant.

DATED this 27th day of December, 2012.

Respectfully Submitted,

/s/ Bryan T. Adamson
Attorney for the Defendant

**Certificate of Mailing**

This is to certify that on this 27 day of December, 2012, I caused a true and correct copy of ANSWER TO PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT to be mailed via U.S. Mail, first class, postage pre-paid, and facsimile to the following:

Tracy R. Terhune
11230 Peachgrove Street #209
North Hollywood, CA 91601

/s/ Rachel Campbell
Secretary

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

2            FOR THE COUNTY OF LOS ANGELES

3   DEPARTMENT 3        HON. ROBERT P. APPLEGATE, JUDGE

4

5   KATIE BIRCHARD,              )        &🖐 ORIGINAL
                                 )
6              PETITIONER,       )
                                 )
7           VS.                  )SUPERIOR COURT
                                 )NO. ES013781
8   TRACY TERHUNE,               )
                                 )
9              RESPONDENT.       )
    _____)

10

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                      APRIL 12, 2010

14

15  APPEARANCES:

16  FOR THE PETITIONER:     KATIE BIRCHARD

17

18  FOR THE RESPONDENT:     FADI K. AMER

19

20

21

22

23

24                      GAIL PEEPLES, CSR NO. 11458
                        OFFICIAL REPORTER
25

26

27

28

| | |
|---|---|
| 1 | CASE NUMBER: ES013781 |
| 2 | CASE NAME: BIRCHARD V. TERHUNE |
| 3 | BURBANK, CALIFORNIA APRIL 12, 2010 |
| 4 | DEPARTMENT 3 HON. MARY DEDERICK, |
| 5 | JUDGE PRO TEM |
| 6 | REPORTER: GAIL PEEPLES, CSR NO. 11458 |
| 7 | TIME: 10:53 A.M. |
| 8 | APPEARANCES: (AS PREVIOUSLY NOTED.) |

10      THE COURT: BIRCHARD AND TERHUNE.

11              GOOD MORNING, MA'AM. WHAT IS YOUR NAME?

12      MS. BIRCHARD: KATIE BIRCHARD.

13      THE COURT: COUNSEL, STATE YOUR APPEARANCE.

14      MR. AMER: GOOD MORNING, YOUR HONOR. FADI AMER

15 HERE ON BEHALF OF DEFENDANT, TRACY TERHUNE.

16      MS. BIRCHARD: YOUR HONOR, I SUBMITTED SOME

17 EXHIBITS THAT THEY LAST HAD. I'M NOT SURE WHERE THOSE

18 ARE RIGHT NOW, BUT I WANTED FOR YOU TO SEE IT.

19      THE COURT: IF IT'S SOMETHING THAT'S GOING TO BE

20 USED, YOU NEED TO LOOK AT THEM.

21      THE BAILIFF: THAT'S WHY WE GAVE THEM TO YOU --

22      MR. AMER: I DID. BUT, YOUR HONOR, IT'S ABOUT --

23 I DON'T KNOW -- 30, 40 PAGES AT LEAST --

24      MS. BIRCHARD: AND YOUR HONOR, I ALSO HAVE SCREEN

25 SHOTS ON A DISK. I DIDN'T -- I COULDN'T PRINT IT OFF.

26 SO OBVIOUSLY THEY CAN'T SEE THAT. BUT THE TEXT IS IN

27 THAT.

28      THE COURT: LET ME INQUIRE ARE THERE WITNESSES IN

1    THIS CASE?

2          MS. BIRCHARD:  YES.

3          MR. AMER:  YES, YOUR HONOR.

4          THE COURT:  YOU HAVE WITNESSES AND THEY'RE PRESENT

5    IN THE COURTROOM?

6          MR. AMER:  YES, YOUR HONOR.

7          THE COURT:  I'M GOING TO ASK THE WITNESSES TO STEP

8    OUTSIDE.

9          MR. AMER:  THEY DID.

10         THE COURT:  OH.  OKAY.

11               THEY ALL DID?

12               THANK YOU, MADAM CLERK.

13               SO NO ONE IN HERE IS TESTIFYING?

14         MR. AMER:  NO, YOUR HONOR.

15         THE COURT:  OKAY.

16         THE BAILIFF:  YOUR HONOR, THIS IS EXHIBITS FOR THE

17   PLAINTIFF, AND THIS IS EXHIBITS FOR THE DEFENDANT.

18         THE COURT:  WE HAVE A REQUEST FOR CIVIL HARASSMENT

19   ORDERS FILED ON FEBRUARY 11, 2010, AND PLAINTIFF KATIE

20   BIRCHARD.

21               NOW -- ALL RIGHT.  YOU MAY PROCEED TO TELL

22   ME ABOUT THE ALLEGATIONS CONTAINED IN YOUR REQUEST OF

23   YOURS.

24         MS. BIRCHARD:  OKAY.  YOUR HONOR, I'VE NEVER MET

25   MR. TERHUNE.  WE'VE BEEN IN THE SAME ROOM BEFORE, BUT

26   WE'VE NEVER MET.

27               I STARTED A SILENT FILM WEB SITE IN MARCH,

28   2008.  AND ONE OF MY MAIN SUBJECTS WAS THE SILENT FILM

1  STAR RUDOLPH VALENTINO.  MR. TERHUNE HAS WRITTEN A BOOK
2  ABOUT THE RUDOLPH VALENTINO MEMORIAL SERVICE, AND HE IS
3  ALSO CURRENTLY THE HEAD PERSON OF IT.  I'M NOT SURE WHAT
4  THE TITLE IS.  I WAS CRITICAL OF THE MEMORIAL SERVICE BUT
5  UNAWARE OF MR. TERHUNE OR WHO HE HAS WAS IN AUGUST, 2008.
6          MR. TERHUNE DECIDED AT THAT TIME -- THERE
7  IS AN EMAIL IN EXHIBIT D TO MISS EVELYN ZEMAYA STATING
8  THAT HE'D BEEN WATCHING ME FOR TWO YEARS, KEEPING TABS ON
9  ME.  AND ABOUT A YEAR LATER -- HE DIDN'T DO ANYTHING.
10 YOU KNOW, I HAD NO CLUE HE EXISTED.
11          A YEAR LATER, ABOUT JUNE, 2009, OR JULY
12 2009, SOMEONE REQUESTED THAT I POST SOME SILENT BOOK
13 REVIEWS ON MY WEB SITE.  YOU KNOW, AS HELPFUL THING.
14 THAT'S WHAT I DID.  SO I DID.  AND I GAVE MR. TERHUNE'S
15 BOOK A ONE NINE REVIEW.  I HAD SKIMMED THE BOOK, AND IT
16 JUST WASN'T IMPRESSIVE TO ME.  AND I SAID AS MUCH.  I
17 SAID IT'S NOT A BAD BOOK, IT'S JUST UNNECESSARY.
18          WELL, MR. TERHUNE DECIDED HE HAD TO
19 SABOTAGE ME, DO AWAY WITH ME, SLANDER MY BUSINESS,
20 SLANDER ME AND SO FORTH.
21          I NOTICED A TURN IN THE COMMUNITY IN PEOPLE
22 I'VE KNOWN IN AUGUST AND SEPTEMBER, 2009, WHICH IS WHAT
23 TIME A SILENT FILM EVENT CALLED CINECOM TOOK PLACE.  AND
24 MANY OF MR. TERHUNE'S CHARACTER WITNESSES TODAY ARE
25 INVOLVED IN CINECOM.  I COULDN'T UNDERSTAND WHAT THE
26 NEGATIVE -- YOU KNOW, WHAT THIS HARSH NEGATIVE REACTION
27 CAME FROM.  YOU CAN SEE THAT IN THE EMAILS IN EXHIBIT E.
28 I WAS CONFOUNDED.

1    I FINALLY SPOKE WITH SOMEONE, HUGH NEALY,
2  OF MARY PICKFORD INSTITUTE.  HE WAS THE ONE WHO INVITED
3  ME.  AND HE SAID -- HE KIND OF FILLED ME IN THAT TRACY
4  WAS THE ONE WHO'S BEEN SAYING "WHAT'S WITH THIS GIRL?"
5  HUGH WAS VERY PEACEFUL PERSON.  HE SAID JUST LET IT GO.
6    SO I WAS GOING TO.  AND MR. TERHUNE,
7  LITERALLY ALMOST THE NEXT DAY -- AND I BELIEVE WAS
8  OCTOBER, 2009 -- POSTED ON NIGHTSHADE.COM, IT'S IN
9  EXHIBIT D, A POST RAILING ME SAYING I -- I GO BY THE PEN
10  NAME HALA PICKFORD.  THAT'S WHAT EVEN MY FAMILY CALLS ME
11  EVEN THOUGH MY LEGAL NAME IS KATIE BIRCHARD.
12    MR. TERHUNE ALLEGED MANY FALSE THINGS,
13  INCLUDING THAT I MADE A SLANDEROUS COMMENT AGAINST MISS
14  DONNA LITTLE, AND HE ALLEGED MY NAME WAS LISA BASED OFF
15  AN AMAZON REVIEWER NAMED LISA BURT.  BUT THAT IS NOT MY
16  NAME.
17    I'M SORRY.  IT'S A LONG STORY.
18    BUT TO GET TO ANOTHER POINT --
19    THE COURT:  JUST SLOW DOWN FOR THE REPORTER --
20    MS. BIRCHARD:  OH.  I'M SORRY.
21    SO IN DECEMBER -- I WROTE AN ARTICLE ABOUT
22  CINECOM REVIEWING IT.  AND IT WAS A NEGATIVE REVIEW.  I
23  DID NOT LIKE CINECOM.  THAT'S WHY MANY OF HIS CHARACTER
24  WITNESSES TODAY ARE HERE TODAY.  I EITHER MET THEM ONCE
25  OR I NEVER MET THEM AT ALL.
26    HE'S LIKE, "GOT TO GET THAT GIRL."
27    THEN I POSTED A POST ABOUT THE HARASSMENT
28  I'VE BEEN DEALING WITH, BUT I DID NOT NAME ANYONE BECAUSE

1    I DID NOT KNOW HE WAS DOING IT AT THE TIME.  AND THEN I

2    POSTED AN ARTICLE CALLED "DEATH TO THE KOOKIES' LIES."

3    AND THAT WAS -- I THINK THAT WAS THE FIRST PLACE THAT I

4    USED MR. TERHUNE'S NAME AND JUST -- YOU KNOW, JUST

5    DEFENDING MYSELF AGAINST WHAT HE'S PUTTING OUT THERE.

6    THIS HAD TO BE NOVEMBER, 2009, OR OCTOBER, 2009.

7            IN DECEMBER, 2009 -- AND THIS IS WHY WE'RE

8    HERE TODAY -- I HAD TAKEN TIME OFF TO WRITE TWO BOOKS.

9    AND ON CHRISTMAS DAY, CHRISTMAS DAY, I WAKE UP TO A EMAIL

10   FROM MR. TERHUNE, WHICH IS IN EXHIBIT D, BASICALLY SAYING

11   "OH, WELL, DO YOU KNOW WHAT?  SINCE YOU SLANDER EVERYONE,

12   I'M GOING TO SHOW YOU --"  LET'S SEE.  "SINCE THIS IS MY

13   FIRST EMAIL TO YOU AND YOU'RE SLANDEROUS, PLEASE VISIT

14   THIS LINK BELOW.  AND I'M GOING TO SEND IT OUT TO MY NEWS

15   GROUP OF 500 PEOPLE.  OH, BY THE WAY, DID YOU WANT ME TO

16   MAIL YOU A COPY OF IT?  I CAN EASILY SEND IT TO MY HOME

17   ADDRESS WHICH IS LISTED HERE IF YOU WOULD LIKE."

18           MY LEGAL NAME, MY HOME ADDRESS IS NOT

19   PUBLIC INFORMATION.

20           MR. TERHUNE HAS SUBMITTED A 411.COM

21   PRINTOFF THAT SAYS "KATIE BIRCHARD" AND MY HOME ADDRESS.

22   THERE'S NO DATE ON THAT.  I SUSPECT HE SUBMITTED IT.  BUT

23   TO BOOT, HOW DID HE GET MY REAL NAME?  HE HAD TO HAVE

24   DONE SOME SLEUTHING.

25           THIS IS CHRISTMAS DAY.  I MEAN, THIS -- I

26   PRINTED OFF IN EXHIBIT D HIS -- NOT ONLY HIS EMAILS BUT

27   ALSO HIS POST, YOU KNOW, JUST -- IT'S, LIKE, ALMOST 3

28   PAGE TIRADE AGAINST ME AND REPEATED -- REPEATEDLY SAYING

1  "KATIE LYNN BIRCHARD, FICTITIOUSLY KNOWN AS HALA

2  PICKFORD."  AND HE MAKES ALL THESE FALSE ACCUSATIONS,

3  WHICH ARE NOT FOR THIS COURT TODAY.

4              I MEAN, NOT ONLY DID HE PUT OUT MY PERSONAL

5  INFORMATION, HE PUT OUT --

6

7                  (PETITIONER ADMONISHED TO SLOW DOWN BY THE

8                  COURT REPORTER.)

9

10     MS. BIRCHARD:  HE PUT OUT MY ONLINE USER NAMES,

11  WHICH HAD NOTHING TO DO WITH HIM AND HAD NOTHING DO WITH

12  ANYONE, NO SLANDER OR ANYTHING.  JUST NOTHING.  AND HE

13  ALSO, YOU KNOW -- YOU HAVE TO FORGIVE ME.  I'M GOING TO

14  HAVE TO FIND IT HERE.

15              BUT HE -- HE ALSO HE PUT MY -- MY

16  14-YEAR-OLD SISTER'S NAME, ABBEY BIRCHARD.  ABBEY NICOLE

17  BIRCHARD.  AND HE PUT IN BIG BOLD LETTERS.

18

19                  (REPORTER REQUESTED MS. BIRCHARD SLOW DOWN

20                  AND/OR REPEAT.)

21

22     MS. BIRCHARD:  IT'S A LOT OF POSTS.  OH.  HERE IT

23  IS ON THE BOTTOM OF THE PAGE AFTER THE START OF THIS --

24  THE PAGE AFTER HIS EMAIL.  AT THE BOTTOM IT SAYS -- THIS

25  IS A QUOTE -- WAIT.  SORRY.

26              "WHY NOT.  WITH A FEW STRIKES OF THE

27  KEYBOARD, KATIE LYNN BIRCHARD BECAME THE FICTIONAL HALA

28  PICKFORD.  EVEN HER OWN SISTER, ABBEY NICOLE BIRCHARD,

1   WROTE ABOUT THE IDENTITY CHANGE.  ANYWAY, "OH MY GOD,
2   HALA KITTY IS MY SISTER BUT SHE JUST GOES BY HALA NOW.'"
3               AND I HAVE THE SCREEN SHOTS OF SOME OF
4   THIS.  I KNOW IT'S HARD TO SEE.  BUT HE PUT THESE IN BIG,
5   BOLD LETTERS.  HE WENT OUT OF HIS WAY.  AND YOU COULD
6   NOT -- HE CLAIMED THAT HE GOT MY SISTER'S NAME FROM A
7   BOOK.  BUT YOU WOULD HAVE TO GET MY FULL LEGAL NAME TO
8   BEGIN WITH TO GET THE REST OF THAT.  AND, ALSO, THAT DOES
9   NOT GEL WITH WHAT -- THE EXHIBITS D AND E BECAUSE HE
10  MAKES CLAIMS TO SOME GIRL GIVING HIM THE INFORMATION.
11              AND THAT GOES BACK TO HOW DID YOU GET MY
12  LEGAL NAME AND THEN ARE YOU SURE THAT'S HOW YOU GOT MY
13  ADDRESS.
14              BECAUSE I THINK HE GOT -- WHAT HE DID WAS
15  IN EARLY DECEMBER -- THIS IS WHAT I SUSPECT.  HE -- IN MY
16  PAY PAL ACCOUNT I HAD TO USE MY LEGAL LAST NAME.  HALA
17  BIRCHARD IS WHAT IT SAID.  BUT HE TOOK THAT, GOOGLED
18  THAT, OBTAINED MY ASCAP, WHICH YOU'RE NOT SUPPOSED TO
19  SEARCH UNLESS YOU'RE A SONGWRITER, MUSIC FOR COPYRIGHT
20  PURPOSES, CAME UP AS HALA KITTIE KATIE BIRCHARD.  THAT
21  WAS MY NAME AS SONGWRITER.  AND THEN FROM THERE HE HAD
22  KATIE BIRCHARD.
23              WELL, THEN HE HAD MICHAEL YAKENTOSS, AS A
24  TEST IN EXHIBIT F A STATEMENT BY ELENA ARCHER, WHO COULD
25  NOT BE HERE TODAY BUT SHE WANTED TO WRITE A WITNESS
26  STATEMENT.  HE -- MICHAEL YAKENTOFF WAS A FRIEND OF HERS.
27  AND HE ASKED FOR MY ADDRESS, WHICH ELENA HAD BECAUSE WE
28  WERE WORKING ON A PROMOTION TOGETHER.  AND THEN ALL OF A

1  SUDDEN SHORTLY AFTER THAT TRACY HAS MY ADDRESS.  I'M

2  PRETTY SURE THAT'S HOW HE GOT IT.  I CAN'T PROVE IT; BUT

3  I'M PRETTY SURE.

4          ANYWAYS, THE REASON I'M HERE TODAY FOR A

5  RESTRAINING ORDER IS BECAUSE MR. TERHUNE DID NOT STOP

6  WITH THE CHRISTMAS DAY TIRADE.  I MEAN, I WAKE ON

7  CHRISTMAS DAY, HERE'S ALL MY PERSONAL INFORMATION, HERE'S

8  MY LITTLE SISTER'S PERSONAL INFORMATION.  AND FOR WHAT?

9  BECAUSE YOU DIDN'T LIKE THE REVIEW OF MY BOOK?  BECAUSE

10 YOU DIDN'T LIKE THAT I SAID YOU -- I DON'T LIKE THE

11 VALENTINO MEMORIAL SERVICE, WHICH I CALLED THE DEATH

12 FEST.  I DON'T LIKE IT; I THINK IT'S STUPID.

13          BUT THAT'S -- MR. TERHUNE HAS EVERY RIGHT

14 TO GIVE ME A BAD REVIEW OR SAY "OH, I DON'T LIKE THAT" OR

15 "I DON'T LIKE HER."  BUT TO SAY I'M A FRAUD AND A

16 CRACKPOT AND ALL THIS TERRIBLE STUFF AND INVADE MY

17 PRIVACY AND MY FAMILY'S PRIVACY -- HE TOLD -- MY

18 FRIEND -- ON CHRISTMAS DAY WHEN THIS TIRADE WENT OUT, I

19 MADE A QUICK EMAIL BLAST TO EVERY FRIEND I COULD THINK

20 OF.  AND A DAVID GASTON, WHOSE REAL NAME IS BRIAN GASTER,

21 I BELIEVE -- HE LIVES IN COLORADO.  AND UNFORTUNATELY I

22 DID NOT GET A STATEMENT FROM HIM FOR THIS.  I WAS NOT

23 ABLE TO CONTACT HIM AS WE ARE NO LONGER IN CONTACT.  BUT

24 HE CALLED TRACY ON TRACY'S LISTED PHONE NUMBER.  AND THIS

25 IS CHRISTMAS DAY ABOUT 2:00 PM.  HE SAID TRACY WAS

26 EXTREMELY ANGRY, JUST RANTING AND RAVING, JUST OUT OF

27 NOWHERE.

28          AND HE MENTIONS "OH, WELL, I WANT TO MEET

1  WITH HER.  ISN'T THERE A SIZZLER BY HER HOUSE?"

2          AND THERE IS INDEED A SIZZLER ABOUT TWO

3  BLOCKS FROM MY HOUSE.  AND, I MEAN, EVEN IF YOU GET MY

4  ADDRESS AND YOU -- I MEAN, THAT'S PRETTY HARSH TO BE ABLE

5  TO GET MY ADDRESS AND SEND IT TO ME AND BE LIKE, OH, YOU

6  KNOW -- THAT'S QUITE THREATENING RIGHT THERE.

7          YES, YOU COULD LOOK THAT UP ONLINE.  BUT HE

8  DID HIS HOMEWORK.  YOU KNOW.  HE KNEW WHERE I WAS.  HE

9  KNEW WHAT WAS AROUND ME.  HE COULD COME AND HARM ME IF HE

10  WANTED.

11          SO HE TRIED TO BLACKMAIL ME BASICALLY INTO

12  TAKING DOWN ANY CRITICAL REVIEWS OF HIM.  AND YOU CAN SEE

13  IN EXHIBIT D THERE'S AN EMAIL FROM DAVID AND HIM SAYING

14  ALL THE STUFF HE WANTS REMOVED, CALLED "NON-COMPLIANCE

15  FROM TRACY."

16          AND YOU CAN SAY THE QUOTES FROM DAVID DON'T

17  HAVE ANYTHING TO DO WITH MR. TERHUNE, THEY'RE JUST A

18  MEMORIAL SERVICE OR KOOKIE OR SOMETHING.  BUT IT'S NOT

19  ABOUT MR. TERHUNE.

20          THAT'S THE MOMENT I DECIDED I'M NOT GOING

21  TO DEAL WITH THIS BULLY.  WHEN -- YOU KNOW -- I'M NOT IN

22  GOOD HEALTH.  I HAVE RHEUMATOID ARTHRITIS.  I'M

23  UNEMPLOYED.  I'M PRETTY CLOSE TO BEING DISABLED LEGALLY.

24  I HAVEN'T APPLIED FOR IT; I DON'T WANT TO.  I MEAN, TO

25  DEAL -- I WAS ON NO MEDICATION EXCEPT IBUPROFEN DURING

26  THIS TIME.

27          AND I SAID REPEATEDLY IN MY EMAILS IN

28  EXHIBIT E TO ELENA ARCHER AND A FEW OTHERS THAT "I'M

1  GOING TO FILE FOR THIS, I'M GOING TO FILE FOR THIS AS

2  SOON AS I GET A CHANCE."

3          THIS WAS LONG BEFORE MR. TERHUNE HAD

4  LAWYERED UP.

5          HE'S ALLEGING THIS IS JUST -- THIS IS JUST

6  A -- YOU KNOW, JUST A FRIVOLOUS THING AND I SHOULD HAVE

7  TO PAY HIS EXPENSIVE LAWYER FEES.

8          BUT IT'S NOT FRIVOLOUS.  YOU DON'T PUT

9  SOMEONE'S 14-YEAR-OLD SISTER'S NAME ONLINE AND DIG UP

10 THEIR -- THEIR REAL LEGAL NAME AND HOME ADDRESS AND KNOW

11 WHERE THEIR HOME IS AND THREATEN THEM LIKE THAT.

12         I WANT HIM TO LEAVE ME ALONE.  I WANT

13 HIM TO QUIT -- I MEAN, HE DIDN'T EVEN LEARN HIS LESSON

14 WITH PUTTING THINGS ONLINE.  HE PUT UP TWO MORE ARTICLES,

15 WHICH ARE BOTH IN EXHIBIT D, AFTER -- BECAUSE WE BOTH

16 AGREED TO TAKE SOME DOWN.  BECAUSE I WAS WILLING TO

17 COMPLY JUST TO MAKE THIS GO AWAY.

18         AND WHEN HE STARTED MAKING MORE AND MORE

19 DEMANDS IS WHEN I SAID, "FORGET IT, I'M NOT DOING IT."

20         THAT'S WHEN HE STARTED PUTTING UP MORE AND

21 MORE.  AND I STARTED HITTING IT WITH DCMA, DIGITAL

22 MILLENNIUM COPYRIGHT ACT, CLAIMS BECAUSE HE KEPT PUTTING

23 UP PHOTOS OF ME TO BOOT, JUST FOR GOOD MEASURE, ALONG

24 WITH MY NAME SO THAT ANYONE WHO WANTS TO HARM ME CAN FIND

25 IT.

26         FINALLY, HE MUST HAVE GOT HIS LAWYER IN,

27 LIKE, JANUARY, AND HE WAS ADVISED TO TAKE DOWN THOSE

28 POSTINGS.  AND THEN HE STARTED THREATENING ME WITH A

1   LEGAL LETTER.

2           AND I SAID, "WELL, GEE, I BETTER PROTECT

3   MYSELF."

4           ABOUT THE SAME TIME -- YOU CAN ALMOST SEE

5   THE TIME LINE BECAUSE MY FIRST APPOINTMENT WHERE I GOT

6   MEDICATED WAS, I THINK, FEBRUARY 3. FEBRUARY 1 OR 3. SO

7   IT WAS -- RIGHT AFTER THAT IS WHEN I APPLIED FOR THAT --

8   I MEAN, HE'S A RAT AND HE'S VERY -- HE CAN JUST BLEND

9   INTO A CROWD. YOU CAN'T EVEN FIND HIM. HE'S VERY

10   AVERAGE LOOKING.

11          BUT HE'S ALWAYS SEEING ME. HE ALWAYS GOES

12   OUT OF HIS WAY TO SAY HE'S SEEN ME AND DID THIS. HE WENT

13   TO A SCREENING OF THE FLAPPER AT THE SILENT FILM THEATRE,

14   WHICH I HEAVILY PROMOTED. THIS WAS, I THINK, FEBRUARY 3.

15   AND IT WAS THE DAY BEFORE HIS BIRTHDAY. HE SEEN ME

16   BECAUSE I WON A CONTEST. BUT I DID NOT SEE HIM BECAUSE

17   IT WAS A SOLD-OUT EVENT. 200-SOME PEOPLE. AND ALSO I

18   JUST HAVE TROUBLE PICKING HIM OUT OF A CROWD.

19          WHEN I WENT HOME ON NIGHTSHADEVILLE.COM,

20   THE SAME PLACE HE PUT HIS OTHER TIRADE -- AND HE BARELY

21   POSTS THERE, MAYBE 20 TIMES A YEAR OR SOMETHING -- HE'S

22   LIKE -- HIS WHOLE POST WAS ABOUT SEEING ME AND HOW FAT I

23   WAS.

24          AND HE WENT OUT OF HIS WAY TO DO THIS ON

25   HIS BIRTHDAY. IT'S LIKE HOW ON OBSESSED ARE YOU? HE'S

26   OBSESSIVE, HATEFUL, AND MALICIOUS. AND HE'S DONE THIS TO

27   OTHER PEOPLE BEFORE. HE'S NOT GOING TO STOP. I WANT HIM

28   TO LEAVE ME ALONE. BUT INSTEAD, I JUST KEEP GETTING

1   SERVED WITH NEW LAWSUITS THAT HE CAN MAKE OUT OF HIS

2   FANTASIES.

3            I'M SORRY.  I'M DONE NOW.

4        THE COURT:  MR. AMER.

5        MR. AMER:  MISS BIRCHARD, HOW LONG HAVE YOU --

6        THE COURT:  I'M SORRY.  YOU NEED TO SPEAK UP,

7   SIR.

8        MR. AMER:  MISS BIRCHARD --

9        MS. BIRCHARD:  DO I ANSWER?

10       THE COURT:  ARE YOU CALLING MISS BIRCHARD?

11       MR. AMER:  YES.

12       THE COURT:  PARDON ME?

13       MR. AMER:  I'D LIKE TO CALL MISS BIRCHARD FOR

14   CROSS-EXAMINATION, YOUR HONOR.

15       MS. BIRCHARD:  DO I STAY HERE OR NOT?

16

17                  CROSS-EXAMINATION

18   BY MR. AMER:

19       Q.    GOOD MORNING.

20       A.    GOOD MORNING.

21       Q.    MISS BIRCHARD, HOW LONG HAVE YOU KNOWN

22   MR. TERHUNE?

23       A.    I DON'T KNOW MR. TERHUNE.  THIS IS THE

24   FIRST TIME I'VE SEEN HIM IN A CROWD.  TODAY.

25       Q.    HOW LONG HAVE YOU KNOWN OF HIM?

26       A.    I WOULD SAY IT WAS THE SUMMER OF 2009.  AND

27   I'VE TRIED TO PICK CERTAIN DATES, BUT I REALLY DON'T KNOW

28   THE MONTH.  IT WAS BEFORE AUGUST, BUT IT WAS AFTER MAY.

1      Q.    SO, IS TODAY THE FIRST TIME YOU'RE ACTUALLY
2  SEEING HIM IN PERSON?
3      A.    YES.  TO MY KNOWLEDGE.  I MEAN, WE'VE BEEN
4  IN THE ROOM, YOU KNOW, TOGETHER BEFORE AT EVENTS.  BUT
5  I'VE NEVER SEEN HIM BEFORE.
6      Q.    SO YOU GUYS NEVER HAD ANY RELATIONSHIP
7  TOGETHER?
8      A.    I'M SORRY?
9      Q.    ANY PERSONAL RELATIONSHIP OR ANYTHING LIKE
10  THAT TOGETHER?
11      A.    LIKE WHAT DO YOU MEAN?
12      Q.    DID YOU GUYS EVER -- NEVER MIND.  I'LL TAKE
13  THAT.
14          HOW LONG HAVE YOU BEEN UNEMPLOYED?
15      A.    I'VE BEEN UNEMPLOYED FOR -- OH, WHEN WAS
16  THAT?
17          PROBABLY 2 TO 3 YEARS.  YOU KNOW, I GET
18  LITTLE ODDS AND ENDS.  BUT I DON'T -- I DON'T REALLY HAVE
19  STEADY EMPLOYMENT BECAUSE IT'S VERY HARD FOR ME TO HOLD
20  IT DOWN WITH MY ARTHRITIS.
21      Q.    DO YOU OWN OR BLOG ON CERTAIN WEB SITES?
22      A.    I'M SORRY?
23      Q.    DO YOU OWN ANY WEB SITES?
24      A.    WHAT DO YOU MEAN BY "OWN"?  I DON'T
25  UNDERSTAND.
26      Q.    DO YOU YOU HAVE CERTAIN BLOGS THAT YOU GO
27  AND POST COMMENTS ON?
28      A.    DO YOU MEAN DO I WRITE ON CERTAIN SITES --

1      Q.    YES.

2      A.    YES.

3      Q.    CAN YOU TELL ME SOME OF THE NAMES OF WEB

4  SITES THAT YOU --

5      A.    FORGETTHETALKIES.COM.

6  RUDOLPHVALENTINO.ORG.  THE

7  RUDOLPHVALENTINOFILMFESTIVAL.COM.  THEN THERE'S THE

8  VALENTINO OF FORMS, BUT IT'S A REALLY LONG ADDRESS THAT I

9  CAN'T QUITE REMEMBER.  DWGRIFFITHFOREVER.COM, WHICH I'M

10 CURRENTLY CREATING.  IT'S NOT REALLY DONE.

11 HALAPICKFORD.COM.  PERPETUAL.FLAPPER.BLOGSPOT.COM.

12 1921PVG.COM.

13          I WANT TO SAY THAT'S IT.  I THINK I MIGHT

14 HAVE FORGOTTEN SOMETHING.  I -- I THINK THAT'S MOSTLY

15 IT.

16     Q.    PRIOR TO THIS LAWSUIT HAVE YOU EVER ACCUSED

17 ANYBODY ELSE OF HARASSING YOU?

18     A.    NOT SERIOUSLY, NO.

19          I KNOW YOU GUYS WANT TO PLAY UP THAT VLAD

20 KOSLOV THING.  BUT THAT'S SILLY OBVIOUSLY.  I HAVE

21 NEVER -- THERE IS A VLAD KOSLOV WHO HAS MADE THESE LITTLE

22 SILLY MOVIES ABOUT RUDY.  AND HE WAS HARASSING ME FOR A

23 WHILE BUT NOT IN THE STALKING, COURTROOM SENSE, YOU KNOW.

24 I NEVER TOOK HIM TO COURT.  I NEVER THREATENED TO TAKE

25 HIM TO COURT.  I NEVER SAID, "OH, MR. KOSLOV IS OUTSIDE

26 MY HOUSE" OR HAS MY ADDRESS OR ANYTHING.

27          I MEAN, MR. TERHUNE DOES NOT SEEM TO GET

28 THE DIFFERENCE BETWEEN WHAT IS WRITTEN AND SOMETIMES IN

1  JEST AND WHAT IS WRITTEN IN DEAD SERIOUSNESS.

2  SERIOUSNESS IS WHEN YOU'RE INTO COURT.

3  Q.    BUT YOU DID WRITE BEFORE, DID YOU NOT,

4  ABOUT PEOPLE HARASSING YOU?

5  A.    I SAID THAT DONNA HILL AND VLAD KOSLOV ARE

6  HARASSING ME, YES, AND I STAND BY THAT.  BUT I HAVE NO

7  PLANS TO TAKE EITHER OF THEM TO COURT OVER IT BECAUSE

8  THEY'RE NOT HARASSING ME IN THE LEGAL SENSE.  THEY'RE A

9  PAIN IN MY SIDE AND SPREADING GOSSIP AND DISINFORMATION;

10  BUT THEY'RE NOT THREATENING ME WITH MY HOME ADDRESS AND

11  MY SISTER'S NAME.

12  THE COURT:  MISS BIRCHARD, I'M GOING TO CAUTION

13  YOU ABOUT ANSWERING THE QUESTIONS DIRECTLY.  AND IF THE

14  ANSWER IS A YES OR NO --

15  MR. AMER:  JUST --

16  MS. BIRCHARD:  -- JUST SO A YES OR NO.

17  OKAY.

18  Q.    BY MR. AMER:  HAVE YOU EVER BEEN THREATENED

19  WITH ANY LAWSUITS?

20  A.    NO.

21  Q.    NOBODY'S EVER THREATENED TO SUE YOU?

22  THE COURT:  WHAT'S THE RELEVANCE OF THAT QUESTION,

23  COUNSEL?

24  MR. AMER:  YOUR HONOR, MISS BIRCHARD HAS A PATTERN

25  OF GOING ONLINE AND POSTING EXTREMELY DEFAMATORY

26  STATEMENTS.  AND --

27  THE COURT:  THAT'S A DIFFERENT ISSUE THAN THE ONE

28  THAT'S PRESENTLY BEFORE THE COURT.  WE HAVE HERE THE

```
 1    REQUEST FOR A RESTRAINING ORDER RE CIVIL HARASSMENT --
 2              MS. BIRCHARD:  I SHOULD ADD --
 3         THE COURT:  EXCUSE ME, MA'AM.  EXCUSE ME, MA'AM.
 4              IF YOU HAVE A SEPARATE OR INDEPENDENT
 5    ACTION, CIVIL ACTION, YOU NEED TO TAKE THAT UP IN THE
 6    APPROPRIATE FORUM.
 7         MR. AMER:  I UNDERSTAND.
 8         THE COURT:  BEFORE WE GO BACK ON THE RECORD, I
 9    WANT TO CAUTION BOTH PARTIES -- AND PARTICULARLY YOU,
10    MA'AM, SINCE YOU'RE TESTIFYING -- YOU NEED TO WAIT, YOU
11    NEED TO HEAR THE WHOLE QUESTION, THEN YOU NEED TO RESPOND
12    TO IT.  AND YOU NEED TO NOT INTERRUPT OR SPEAK OVER
13    SOMEONE'S VOICE BECAUSE WE HAVE RECORDINGS GOING ON IN
14    HERE AND OUR COURT REPORTER NEEDS TO TAKE DOWN EVERYTHING
15    THAT'S BEING SAID BY EACH PARTY.
16         MS. BIRCHARD:  OKAY.  MY APOLOGIES.  I'M SORRY.
17    I'M NOT USED TO IT.
18              GO AHEAD.
19         THE COURT:  GO AHEAD.
20         Q.    BY MR. AMER:  MISS BIRCHARD, YOU CLAIM THAT
21    MR. TERHUNE IS HARASSING YOU?
22         A.    YES.
23         Q.    OR HAS HARASSED YOU FOR THE PAST 3 YEARS.
24              IS THAT CORRECT?
25         A.    NO.
26         Q.    HOW LONG DO YOU THINK HE'S BEEN HARASSING
27    YOU FOR?
28         A.    TO MY KNOWLEDGE --
```

1    WELL, AM I ALLOWED TO ANSWER THIS ONE YES
2    OR NO?

3    TO MY KNOWLEDGE, I'D SAY SINCE -- HE'S BEEN
4    HARASSING ME SINCE THE SUMMER OF 2009. BUT IT'S
5    REALLY -- YOU KNOW, I DON'T KNOW FOR SURE BECAUSE I
6    WAS -- I WAS NOT AWARE THAT MR. TERHUNE WAS THE ONE DOING
7    IT UNTIL LATE SEPTEMBER OR OCTOBER OF 2009 BECAUSE BEFORE
8    THAT I THOUGHT IT WAS JUST DONNA HILL.

9        Q.    WHEN YOU SAY HARASS, CAN YOU PLEASE TELL US
10   WHAT YOU MEAN BY THAT.

11       A.    WHAT DO YOU MEAN?

12       Q.    HOW HAS HE HARASSED YOU?

13       A.    I DON'T -- I DON'T KNOW HOW TO EXPLAIN.
14   LIKE, WHAT DO I --

15       Q.    LIKE, WHAT HAS HE DONE FOR YOU TO FEEL LIKE
16   HE WAS HARASSING YOU?

17       A.    HE HAS HARASSED ME VERBALLY TO PEOPLE BY
18   SAYING "OH, THIS GIRL'S TERRIBLE AND SHE'S A FRAUD AND
19   SHE'S DERANGED."

20       I MEAN, YOU CAN SEE IT IN -- I BELIEVE IT'S
21   EXHIBIT 8 TO -- IT'S EMAIL TO EVELYN ZEMAYA. MISS ZEMAYA
22   JUST SENT A QUERY LETTER A FEW PAGES -- NOT EVEN A FEW
23   PAGES, A FEW PARAGRAPHS WHICH ARE INCLUDED, AND
24   MR. TERHUNE REPLIED WITH A TWO-PAGE JUST TIRADE AGAINST
25   ME. THAT -- I MEAN, THAT, TO ME, IS KIND OF THE
26   DEFINITION OF THIS HARASSMENT AND THIS -- THIS JUST
27   ONGOING HATRED AND OBSESSIVE, YOU KNOW, OBSESSION TO GET
28   RID OF ME.

1         I MEAN, HE LITERALLY TOLD DAVID GASTON THAT

2   THERE WAS AN ANTI-HALA COALITION AND THEY WERE ALL SET TO

3   TAKE ME AWAY AND MAKE ME NEVER WRITE ANYTHING AGAIN. I

4   MEAN, THAT'S HARASSMENT. THAT'S HARASSMENT, YOU KNOW.

5       Q.    IS THAT IT?

6       A.    YES.

7       Q.    ON YOUR COMPLAINT YOU STATED THAT HE

8   HARASSED YOU ON THE EVENING OF WEDNESDAY, FEBRUARY 3?

9       A.    FEBRUARY 3.

10       NO. I DID NOT SAY THAT. I SAID HE WAS

11  THERE, THAT I WAS NOT AWARE OF HIM. THE HARASSMENT CAME

12  THE NEXT DAY ON HIS BIRTHDAY WHEN HE DECIDED THAT HE HAD

13  TO SAY HOW FAT I WAS. I SAID HE WAS PRESENT ON FEBRUARY

14  3, I JUST WAS NOT AWARE OF IT.

15      Q.    SO WHY WAS HIS PRESENCE RELEVANT?

16      A.    HIS PRESENCE IS RELEVANT FOR TWO REASONS.

17  IN THE CASE THAT SOMEONE IS SITTING HERE THREATENING YOU

18  WITH "I HAVE YOUR HOME ADDRESS AND I HAVE ALL YOUR

19  PERSONAL INFORMATION AND I'M GOING TO DO AWAY WITH YOU,

20  I'M GOING TO MAKE YOU GO AWAY AND I'M GOING TO SUE YOU

21  INTO OBLIVION" THEN -- I MEAN, MR. TERHUNE'S TIRADES,

22  WHICH YOU CAN SEE IN EXHIBIT D ESPECIALLY -- I MEAN, WHEN

23  YOU READ THAT, THAT'S JUST FULL OF HATEFUL AND MALICIOUS

24  CONTENT.

25       I MEAN, I MAKE LITTLE CHILDISH NAMES LIKE

26  "KOOKIE," BUT I'M NOT "OH, MR. TERHUNE, I KNOW WHERE YOU

27  LIVE, I'M GOING TO GET YOU." I'M NOT, LIKE, "OH, I'M

28  GOING TO POST ABOUT YOUR FAMILY."

1       IT'S RELEVANT BECAUSE IF HE'S IN A CROWD

2   AND I CAN'T SEE HIM AND HE CAN JUST GO FREE WILLY-NILLY

3   AND SNEAK UP AND DO WHATEVER HE WANTS -- I MEAN, I WAS

4   TFRRIFIED THAT NIGHT.  I CALLED MY FRIEND SEVERAL

5   TIMES --

6

7           (REPORTER REQUESTED MS. BIRCHARD SLOW DOWN

8            AND/OR REPEAT.)

9

10      THE WITNESS:  I'M SORRY.

11          I SAID I DON'T SEE HIM, I DON'T SEE HIM.

12  BECAUSE THAT WAS THE FIRST TIME I HAD GONE TO THAT

13  THEATRE SINCE THE INCIDENT.  AND I HAD HEAVILY PROMOTED

14  THIS EVENT.

15          SO MR. TERHUNE, AS YOU CAN SEE -- I THINK

16  IT'S EXHIBIT -- OH, SHOOT.  I THINK IT'S EXHIBIT F.  IT'S

17  THE STACK COUNTERS I INCLUDED.  IT MIGHT BE G.  F OR G.

18  HE'S ALWAYS ON MY SITE.  HE REPEATEDLY READS THE SAME

19  ARTICLES OVER AND OVER AGAIN.  I MEAN, HE'S WATCHING FOR

20  SOMETHING TO SABOTAGE AND POSSIBLY TO HARM ME.

21          AND IT'S RELEVANT BECAUSE ON FEBRUARY 4,

22  HIS BIRTHDAY, HIS BIRTHDAY, HE GOES ONLINE, HE'S LIKE, "I

23  GOT TO TALK ABOUT HOW FAT THIS CHICK IS."

24          I MEAN, HOW MUCH HATRED DO YOU HAVE TO HAVE

25  FOR SOMEONE ON CHRISTMAS DAY AND ON YOUR BIRTHDAY, "OH, I

26  GOT TO GET THIS GIRL," YOU KNOW.

27      Q.   BY MR. AMER:  SO HE -- YOU'RE NOT ALLEGING

28  THAT HE EVER CAME UP TO YOU, THAT HE EVER SPOKE WITH YOU,

1   THAT HE HAD EVER DID ANYTHING ON THAT DAY?

2       A.    NO.    BUT ACCORDING TO HIS OWN WITNESS

3   STATEMENTS, HE WAS WELL AWARE I WAS THERE AND THOUGHT WAS

4   MADE TOWARDS DOING IT.

5           IT'S NICE TO SEE ONE OF MR. TERHUNE'S

6   WITNESSES IS IN THE AUDIENCE NOW.

7       THE COURT:   NEXT QUESTION.

8       Q.    BY MR. AMER:   YOU WON A PRIZE THAT DAY,

9   DIDN'T YOU?

10      A.    I'M SORRY?

11      Q.    YOU WON A PRIZE THAT EVENING, FEBRUARY 3 --

12      A.    YES.

13      Q.    WAS YOUR NAME ANNOUNCED?

14      A.    NO.

15      Q.    SO HOW DID YOU KNOW TO COME UP TO THE

16  STAGE?

17      A.    BECAUSE THERE WAS A WOMAN WHO HAD A DVD FOR

18  A PRIZE.   AND SHE SAID, "CAN ANYONE TELL ME WHERE THE

19  SILENT FILM STAR OLIVE THOMAS DIED, WHERE DID SHE EXACTLY

20  DIE."   AND PEOPLE STARTED SHOUTING OUT "PARIS."

21          AND I WASN'T GOING TO SAY ANYTHING BECAUSE

22  I KNEW IT WASN'T REALLY FAIR.   BUT I WAS LIKE "THE

23  AMERICAN HOSPITAL IN PARIS." AND I WON.

24          AND SHE SAID, "OH, WELL, HERE.   THANK YOU."

25          AND THEN THE EMCEE SAYS "OH, THIS GIRL'S

26  BEEN GOING TO THE FLAPPER SCREENING FOR A WHILE NOW."

27          I MEAN, IT WAS NEVER ANNOUNCED --

28      THE COURT:   MISS --

1    THE WITNESS:  I'M SORRY --

2    THE COURT:  -- YOU NEED TO ANSWER ONLY THE

3  QUESTION AND NOT GO INTO THESE LONG NARRATIVES.

4    THE WITNESS:  MY APOLOGIES.

5    THE COURT:  YOU DON'T NEED TO APOLOGIZE.

6         YOU NEED TO FRAME YOUR QUESTION

7  APPROPRIATELY SO THAT SHE CAN ANSWER IT SUCCINCTLY.

8    THE WITNESS:  YES, SIR.

9    THE COURT:  DON'T CALL ME "SIR."

10   THE WITNESS:  DID I?

11        I'M SO SORRY.  YES, YOUR HONOR, MA'AM.

12   Q.    BY MR. AMER:  MISS BIRCHARD, DID YOU EVER

13  MAKE ANY STATEMENTS ABOUT WANTING TO TAKE MR. TERHUNE'S

14  MONEY?

15   A.    I MADE ONE -- WELL, CAN I SAY THIS?  IT

16  SHOULDN'T BE --

17   THE COURT:  YES OR NO?

18   THE WITNESS:  YES; BUT NOT IN THE WAY HE'S

19  ALLEGING.

20   Q.    BY MR. AMER:  DID YOU EVER WRITE ON

21  FORGETTHETALKIES -- AND I'M QUOTING HERE -- "AND I

22  EAGERLY AWAIT OWNING HIS COLLECTION AND TAKING ALL HIS

23  MONEY" --

24   A.    YES --

25

26        (REPORTER REQUESTED MR. AMER AND MISS

27        BIRCHARD SLOW DOWN AND NOT TALK

28        SIMULTANEOUSLY.)

1

2          Q.     BY MR. BIRCHARD:  -- "I EAGERLY AWAIT

3    OWNING HIS COLLECTION AND TAKING ALL HIS MONEY FOR HIS

4    CRASS AND DOWNRIGHT SCARY BEHAVIOR"?

5          A.     YES, I WROTE THAT.  BUT IT WAS --

6          Q.     THE QUESTION WAS --

7

8               (REPORTER REQUESTED MR. AMER AND MISS

9               BIRCHARD SLOW DOWN AND NOT TALK

10              SIMULTANEOUSLY.)

11

12         THE COURT:  OKAY, FOLKS.

13         THE WITNESS:  I'M SORRY.  I'M NOT USED TO THIS.

14   I'M TRYING VERY HARD --

15         THE COURT:  DO NOT SPEAK UNLESS YOU'RE ANSWERING A

16   QUESTION.

17              OKAY?

18         THE WITNESS:  UH-HUH.

19         THE COURT:  WHAT IS THE QUESTION, COUNSEL?

20         MR. AMER:  I WAS JUST ASKING WHETHER OR NOT SHE

21   WROTE THAT SHE WAS LOOKING FORWARD TO TAKING HIS MONEY

22   AND OWNING HIS COLLECTION.

23         THE COURT:  AND THE ANSWER WAS?

24         THE WITNESS:  YES, BUT NOT IN THE WAY HE'S TRYING

25   TO MAKE ME OUT TO -- TO BE.

26         THE COURT:  YOU'LL BE ABLE TO RESPOND TO THAT.

27         THE WITNESS:  I'M SORRY?

28         THE COURT:  YOU'LL HAVE AN OPPORTUNITY TO RESPOND.

1      Q.    BY MR. AMER:  MISS BIRCHARD, YOU CLAIM THAT

2  MR. TERHUNE FREQUENTLY VISITS YOUR WEB SITES?

3      A.    YES.

4      Q.    DO YOU HAVE ANY REASON OR ANY SPECULATION

5  AS TO WHY HE WOULD DO THAT?

6      A.    BECAUSE HE'S OBSESSED WITH ME.

7      Q.    OKAY.

8      DO YOU -- WHY DO YOU THINK HE'S OBSESSED

9  WITH YOU?

10     A.    BECAUSE HE HAS AN OBSESSIVE HATRED THAT

11  BORDERS ON SOME PERSONALITY DISORDER.  THOUGH I'M NOT A

12  DOCTOR, SO I CAN'T DO THAT.  I MEAN, IT'S ONE THING TO

13  LOOK FOR NEW UPDATES; BUT MR. TERHUNE CONTINUALLY READS

14  THE SAME ARTICLES OVER AND OVER AGAIN.

15     Q.    HAVE YOU EVER USED THE TERM "KING

16  KOOKIE"?

17     A.    YES.

18     Q.    WHO DO YOU REFER TO WHEN YOU SAY THAT?

19     A.    THE KING OF ALL KOOKIES, MR. TERHUNE.

20     Q.    WHAT DOES THE "KING OF ALL KOOOKIES"

21  MEAN?

22     A.    IT JUST MEANS THE GUY WHO LEADS THE

23  VALENTINO MEMORIAL SERVICE, WHICH IS GATHERING OF

24  KOOKIES.

25     Q.    DO YOU KNOW HOW MANY TIMES YOU'VE REFERRED

26  TO HIM AS "KING KOOKIE"?

27     A.    PROBABLY SEVERAL.  THAT'S HOW I ALWAYS

28  REFER TO HIM BECAUSE I DON'T WANT TO GIVE HIM ANY POWER

1    BY USING HIS NAME.

2         Q.    WOULD YOU AGREE THAT YOU'VE AT LEAST POSTED

3    OR WROTE A DOZEN, OR EVEN DOZENS, OF COMMENTS REGARDING

4    MR. TERHUNE?

5         A.    I THINK THAT'S TOO VAGUE A QUESTION.  IT'S

6    NOT ACCURATE BECAUSE --

7              WELL, FIRST, YOUR HONOR --

8         THE COURT:  WAIT A MINUTE.  WAIT A MINUTE.  WAIT A

9    MINUTE.  WAIT A MINUTE.

10             DO YOU UNDERSTAND THE QUESTION, YES OR NO?

11        THE WITNESS:  NOT REALLY.

12        THE COURT:  REPEAT THE QUESTION.

13        Q.    BY MR. AMER:  IN YOUR BEST ESTIMATE, HOW

14   MANY TIMES HAVE YOU WROTE OR POSTED ABOUT MR. TERHUNE IN

15   THE PAST YEAR?

16        A.    THE DISTINCTION I WANT TO MAKE -- BECAUSE I

17   FEEL IT IS IMPORTANT -- IS YOU WANT TO INCLUDE ALL

18   REFERENCES TO "KOOKIE" OR ALL FORUM POSTINGS JUST WHERE

19   YOU'RE MAKING A --

20        THE COURT:  MOVE TO STRIKE.  THAT ANSWER IS NOT

21   RESPONSIVE.

22             AND YOU NEED TO MAKE THE PROPER OBJECTIONS.

23   OKAY.  SO ASK THE QUESTION.  AND IF SHE CAN ANSWER IT,

24   SHE WILL; AND IF SHE CAN'T, THEN SHE WON'T.  AND LET'S

25   MOVE ON FOLKS.  IT'S 11:00 O'CLOCK.

26        THE WITNESS:  YES.

27        Q.    BY MR. AMER:  FROM DECEMBER OF 2009 UNTIL

28   TODAY, CAN YOU GIVE US AN ESTIMATE OF HOW MANY TIMES

1  YOU'VE REFERRED OR MENTIONED THE NAME "KING KOOKIE" OR

2  "TRACY TERHUNE" OR THE "KING OF ALL KOOKIES" ALL ON YOUR

3  WEB SITE?

4       THE COURT:  WHAT IS THE RELEVANCE OF THAT WITH

5  REGARDS TO THE REQUEST FOR A CIVIL HARASSMENT RESTRAINING

6  ORDER?

7       MR. AMER:  BECAUSE, YOUR HONOR, SHE THINKS THAT

8  HE'S GOING ON HER WEB SITES TO HARASS HER.  BUT THE ONLY

9  REASON WHY HE'S GOING ON HER WEB SITES IS BECAUSE SHE'S

10  DEFAMING HIM, WRITING ALL THESE THINGS ABOUT HIM, CALLING

11  HIM THE KING OF ALL KOOKIES, MAKING VERY SPECIFIC --

12       THE COURT:  IS THIS A OFFER OF PROOF YOU'RE

13  MAKING?

14       MR. AMER:  YES.

15       THE WITNESS:  COULD I MAKE --

16       THE COURT:  NO.

17       MR. AMER:  SO, WHAT I WOULD LIKE TO SAY, YOUR

18  HONOR, IS THAT THE REASON WHY MR. TERHUNE -- THE ONLY

19  REASON WHY HE'S GONE ON THE WEB SITE, THE ONLY REASON WHY

20  HE KNOWS OF HER, IS BECAUSE SHE IS ENGAGED IN A

21  SYSTEMATIC AND A CONTINUOUS PATTERN OF DEFAMING HIM --

22  AND NOT JUST HIM ALONE, A LOT OF OTHER PEOPLE -- CALLING

23  HIM KING KOOKIE, CALLING HIM VINDICTIVE, BULLYING,

24  ACCUSING HIM OF FRAUD.

25            AND THAT'S -- THAT'S WHAT WE'D LIKE TO --

26  THAT'S OUR OFFER OF PROOF.

27       THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS OF

28  THIS WITNESS?  IF YOU DO, GO AHEAD.  I'M NOT STOPPING

1  YOU.  I JUST WANT TO HELP FOCUS BOTH --

2      MR. AMER:  NO PROBLEM.

3      THE COURT:  UH-HUH.

4      Q.    BY MR. AMER:  HAS MR. TERHUNE EVER CAME TO

5  YOUR HOUSE AS FAR AS YOU KNOW?

6      A.    NOT THAT I KNOW OF.  BUT HOW WOULD I KNOW,

7  YOU KNOW?

8          AND SOMEONE CAME TO SERVE ME FOR THE SMALL

9  CLAIMS COURT AND I WAS NOT HOME --

10      Q.    MISS BIRCHARD --

11          OBJECTION.  NONRESPONSIVE, YOUR HONOR.

12      THE COURT:  SUSTAINED.

13          ASK A QUESTION --

14      THE WITNESS:  OKAY --

15      THE COURT:  HAS ANYONE -- HAS HE EVER COME TO YOUR

16  HOUSE?

17          NOT THAT YOU KNOW OF --

18      THE WITNESS:  NOT TO MY KNOWLEDGE.

19      THE COURT:  THANK YOU.

20      Q.    BY MR. AMER:  HAS HE EVER TRIED TO FOLLOW

21  YOU IN ANY WAY DURING ANY OF THE EVENTS?

22      A.    YOUR HONOR, COULD I JUST ASK HOW WOULD I

23  KNOW ANY OF THIS UNLESS I HAD A PROVEN EVENT?

24          I CAN SAY I THINK HE HAS, BUT IT'S NOT

25  PROOF.  I CAN'T PROVE IT.

26      Q.    YOU UNDERSTAND YOU'RE BRINGING A SERIOUS

27  ALLEGATION AGAINST SOMEBODY, DON'T YOU --

28      A.    YES.  WELL --

1    THE COURT:  MA'AM, HAS HE EVER TRIED TO FOLLOW YOU

2  THAT YOU KNOW OF?

3    THE WITNESS:  I THINK --

4    THE COURT:  DO YOU KNOW OF ANY OCCASION WHERE HE

5  TRIED TO FOLLOW YOU?  YES OR NO?

6    THE WITNESS:  I SUSPECT THE FEBRUARY 3RD THING HE

7  WENT BECAUSE HE KNEW I'D BE THERE.  BUT I CAN'T PROVE IT.

8  SO MAYBE.

9    THE COURT:  ANY OTHER TIMES?

10    THE WITNESS:  LET ME THINK.

11    I WOULDN'T KNOW THE DATE, BUT I MEAN, AS I

12  SAID, HE KNEW ABOUT THE SIZZLER.  SO I SUSPECT HE MAY

13  HAVE STAKED OUT MY NEIGHBORHOOD SOMEHOW.  BECAUSE, I

14  MEAN, YES, YOU CAN GET THAT ONLINE, BUT YOU'D HAVE TO BE

15  VERY SPECIFIC LIKE THAT, YOU KNOW.

16    Q.    BY MR. AMER:  MISS BIRCHARD, LATE JANUARY,

17  2010, YOU RECEIVED A LETTER FROM MY LAW OFFICE, DID YOU

18  NOT?

19    A.    YES.

20    Q.    AND --

21    A.    WELL -- SORRY.  IT WAS IN EARLY FEBRUARY I

22  RECEIVED IT.  BUT I KNOW THAT'S WHEN YOU WROTE IT.

23    Q.    DO YOU KNOW, TO THE BEST -- DO YOU HAVE A

24  RECOLLECTION OF WHAT THAT LETTER ASKED YOU TO DO?

25    A.    IT BASICALLY SAID -- IT'S A VERY

26  THREATENING LETTER.  AND IT SAID IF I DID NOT REMOVE ANY

27  REFERENCES TO HIM OR ANYTHING HE PERCEIVES AS BEING ABOUT

28  HIM -- SUCH AS THE WORD "KOOKIE," WHICH DOES NOT ALWAYS

1   REFER TO MR. TERHUNE -- THAT I COULD AND PROBABLY WOULD
2   BE SUED IN COURT.
3                   I CAN'T -- IT WAS VERY SPECIFIC.  I'M SURE
4   IT'S IN EXHIBIT 5, I THINK, OR 4 --
5                   MR. AMER:  OBJECTION, YOUR HONOR.
6   NONRESPONSIVE.
7                   THE WITNESS:  HOW IS THAT NONRESPONSIVE?
8                   Q.    BY MR. AMER:  DID THAT LETTER ALSO ASK YOU
9   TO REMOVE DEFAMATORY STATEMENTS REGARDING MR. TERHUNE?
10                  A.    I DON'T REMEMBER THE EXACT WORDING.
11                  Q.    DID IT HAVE SOMETHING TO THAT EFFECT?
12                  A.    IT SAID TO REMOVE POSTS ABOUT MR. TERHUNE
13  OR I WOULD BE SUED.  THAT'S WHAT THE GIST WOULD BE.
14                  Q.    DID YOU REMOVE ANY OF THE CONTENTS AS A
15  RESULT OF THAT LETTER?
16                  A.    I HOPE THIS WON'T COUNT AS NONRESPONSIVE --
17                  THE COURT:  DID YOU REMOVE --
18                  Q.    BY MR. AMER:  -- ANY CONTENTS REGARDING
19  MR. TERHUNE AFTER RECEIVING THAT LETTER?
20                  A.    NO, BECAUSE I WANTED TO SEEK MY OWN LEGAL
21  COUNSEL.  THAT'S THE REASON.
22                  Q.    DID YOU EVER WRITE ANY BOOKS?
23                  A.    I HAVE WRITTEN, BASICALLY, ONE AND A HALF
24  IS WHAT I COUNT THAT AS.
25                  WELL, AND I'M WRITING ANOTHER RIGHT NOW.
26                  Q.    AND DID YOU EVER GIVE ANY CREDITS TO YOUR
27  SISTER?
28                  A.    WHAT DO YOU MEAN?

1    ONE, THIS -- I FEEL THIS QUESTION DOESN'T
2  COUNT.  I DON'T KNOW WHAT THE LEGAL --
3    MR. AMER:  OBJECTION, YOUR HONOR.  NONRESPONSIVE.
4    THE WITNESS:  HE'S TRYING --
5    THE COURT:  WAIT A MINUTE.  THE OBJECTION IS
6  SUSTAINED.
7    I'M NOT GOING TO TAKE ANY MORE OF THIS
8  TESTIMONY FROM YOU.  YOU'RE NOT FOLLOWING --
9    THE WITNESS:  I'M SORRY.  I'M JUST -- I'M NOT USED
10 TO IT.
11   THE COURT:  WELL, YOU'RE GETTING USED TO IT.  YOU
12 NEED TO FOLLOW THE DIRECTION OF THIS COURT --
13   THE WITNESS:  WELL, HE --
14   THE COURT:  SIMPLY -- MA'AM --
15   THE WITNESS:  I'M SO SORRY.  I'M VERY NERVOUS.
16   THE COURT:  YOU DON'T NEED TO BE --
17   THE WITNESS:  WELL, I MEAN, HE'S RIGHT THERE --
18   THE COURT:  YOU NEED TO STOP TALKING.
19   WHAT IS THE QUESTION?
20   Q.    BY MR. AMER:  THE QUESTION WAS DID YOU EVER
21 GIVE ANY CREDITS IN YOUR BOOK TO YOUR SISTER?
22   A.    IT'S NOT A CREDIT.  SO NO.  I'M GOING TO
23 SAY NO.
24   Q.    DID YOU EVER MENTION YOUR SISTER IN YOUR
25 BOOK IN ANY WAY?
26   A.    IN A THANK YOU.
27   Q.    SO IS THE ANSWER YES?
28   A.    IN A THANK YOU, YES.  THAT'S WHEN I

1    MENTIONED HER.

2        Q.     MISS BIRCHARD, WERE YOU AWARE THAT YOUR

3    NAME IS PUBLICLY LISTED AND YOUR ADDRESS?

4        A.     NO. AND IT IS NOT. BUT I MEAN --

5        Q.     SO YOU WERE NOT AWARE THAT IT IS?

6       ·A.     IT IS NOT LISTED. NO, IT IS NOT LISTED.

7    I'M NOT UNAWARE; IT'S JUST NOT LISTED.

8        MR. AMER: ONE SECOND, YOUR HONOR.

9

10           (PAUSE IN THE PROCEEDINGS.)

11

12       Q.     BY MR. AMER: I'M ALMOST DONE.

13        A.     OKAY.

14        Q.     YOU MENTIONED A MUTUAL FRIEND BY THE NAME

15    OF MR. I BELIEVE GASTON?

16        A.     DAVID GASTON IS HIS ALIAS. HIS REAL NAME,

17    I BELIEVE, IS RYAN GASTON.

18        Q.     AND HE SERVED AS MEDIATOR AT SOME POINT

19    BETWEEN YOU AND MR. TERHUNE.

20           IS THAT CORRECT?

21        A.     I'M NOT SURE WHAT THIS HAS TO DO WITH THIS

22    CASE, BUT YES.

23        Q.     OKAY. THAT'S ALL.

24        A.     OKAY.

25        Q.     MISS BIRCHARD, DO YOU UNDERSTAND THAT

26    YOU'RE MAKING A SERIOUS ALLEGATION TODAY?

27        A.     YES.

28        THE COURT: THE QUESTION'S BEEN ASKED AND

1   ANSWERED.

2        Q.    BY MR. AMER:  AND YOU -- I'LL WITHDRAW

3   THAT.

4             NO MORE QUESTIONS, YOUR HONOR.

5        THE COURT:  OKAY.  THIS IS YOUR OPPORTUNITY TO

6   RESPOND TO SOME OF THE QUESTIONS THAT WERE ASKED OF YOU

7   SINCE YOU'RE REPRESENTING YOURSELF.

8             I KNOW THAT THAT'S DIFFICULT FOR YOU TO DO.

9   WHAT I'M GOING TO DO IS -- I SHOULD HAVE INQUIRED OF YOU

10  BEFORE -- MAYBE WE COULD MOVE THIS ALONG SINCE YOU'RE THE

11  MOVING PARTY.  DO YOU HAVE ANY WITNESSES YOU NEEDED TO

12  CALL?

13       MS. BIRCHARD:  YES, I DO.

14       THE COURT:  AND WHO ARE THOSE WITNESSES?

15       MS. BIRCHARD:  EVELYN ZEMAYA.

16       THE COURT:  WHAT IS THE NATURE OF HER TESTIMONY?

17       MS. BIRCHARD:  SHE WAS WORKING ON AN ARTICLE ABOUT

18  ME AND MR. TERHUNE AND SHE'S --

19       THE COURT:  I BEG YOUR PARDON?

20       MS. BIRCHARD:  SHE'S ALSO HAD CONTACT WITH

21  MR. TERHUNE.

22       THE COURT:  DOES SHE HAVE ANY PERSONAL KNOWLEDGE

23  OF HAVING OBSERVED ANY OF THE CONDUCT THAT YOU ALLEGE BY

24  MR. TERHUNE DIRECTED TOWARDS YOU?

25       MS. BIRCHARD:  YES.  THE EMAIL IS, I BELIEVE, IN

26  EXHIBIT D.

27             I'M SORRY.  I DON'T HAVE MY LIST WITH ME.

28  I'M NOT SURE THE EXACT EXHIBIT.

1        THE COURT: I'M GOING TO HAND YOU YOUR PACKET

2  BACK. AND I WANT YOU TO SHOW ME WHAT YOU'RE GOING TO

3  CALL THIS WITNESS TO TESTIFY TO.

4        MS. BIRCHARD: I'M SORRY?

5        THE COURT: SHOW ME WHAT YOU'RE GOING TO HAVE HER

6  TESTIFY TO.

7           COUNSEL, WHILE SHE'S DOING THAT I'LL ASK

8  YOU WHO ARE YOUR WITNESSES AND WHAT IS THE NATURE OF

9  THEIR TESTIMONY?

10       MR. AMER: JUST ONE WITNESS, YOUR HONOR, BESIDES

11  MR. TERHUNE. MR. JACK VANCE. HE WAS WITH MR. TERHUNE ON

12  THE EVENING OF FEBRUARY 3. AND HE'S GOING TO TESTIFY

13  THAT IT WAS HIS IDEA -- THAT MR. TERHUNE ONLY WENT TO THE

14  SCREENING BECAUSE HE'D CALLED HIM AND ASKED HIM TO GO

15  WITH HIM. SO IT SHOULDN'T BE A VERY LONG TESTIMONY.

16       MS. BIRCHARD: YOUR HONOR.

17       THE COURT: THANK YOU.

18          AM I MISTAKEN; WASN'T THE TESTIMONY OF THE

19  PLAINTIFF THAT IN FACT SHE DIDN'T SEE HIM ON FEBRUARY 3?

20       MS. BIRCHARD: YES.

21       THE COURT: YOU DID NOT SEE HIM --

22       MS. BIRCHARD: I DID NOT SEE HIM.

23       THE COURT: OKAY. YOU DON'T NEED HIM.

24       MR. AMER: BUT SHE ALSO CLAIMS THAT SHE THINKS HE

25  WENT THERE TO STALK HER.

26       MS. BIRCHARD: WELL, I --

27       THE COURT: WAIT A MINUTE. HE'S NOT ASKING YOU.

28          YOU MAY STEP DOWN.

1      MR. AMER:  AND, ALSO, HE COULD TESTIFY AS TO
2  MR. TERHUNE'S CHARACTER, YOUR HONOR.
3      MS. BIRCHARD:  AND, YOUR HONOR --
4      THE COURT:  MA'AM?
5      MS. BIRCHARD:  UH-HUH, THE OTHER WITNESS STATEMENT
6  I HAVE IS IN EXHIBIT F FROM AN ELAINE ARCHER.  SHE COULD
7  NOT BE HERE TODAY, BUT SHE WISHES TO SUBMIT THAT.
8      THE COURT:  ANY OBJECTION TO F?
9      MR. AMER:  WE WERE JUST GIVEN THE EXHIBITS THIS
10  MORNING.  I DON'T HAVE A COPY OF IT.
11      THE COURT:  YOU DON'T HAVE A COPY?
12      MR. AMER:  NO.
13      MS. BIRCHARD:  I WAS NOT AWARE I HAD TO GIVE HIM A
14  COPY.  SO, MY APOLOGIES.
15      MR. AMER:  AND I HAVE TO STATE FOR THE RECORD THAT
16  WE HAD VERY LITTLE TIME TO REVIEW THEM --
17      THE COURT:  WELL, I JUST READ IT, SO MAYBE YOU CAN
18  DO THE SAME.
19      COUNSEL, YOU NEED TO CALL YOUR FIRST
20  WITNESS BECAUSE YOU'RE RUNNING OUT OF TIME HERE.
21      MR. AMER:  I'D LIKE TO CALL MR. TRACY TERHUNE.
22  I'M CALLING THE DEFENDANT.
23  /////////////
24  /////////////
25  ////////////
26
27
28

```
 1                        TRACY TERHUNE,
 2          CALLED AS A WITNESS ON HIS OWN BEHALF,
 3                     TESTIFIED AS FOLLOWS:
 4
 5                     DIRECT EXAMINATION
 6   BY MR. AMER:
 7          Q.    GOOD MORNING, MR. TERHUNE.
 8          A.    GOOD MORNING.
 9          Q.    MR. TERHUNE, CAN YOU PLEASE TELL THE COURT
10   WHETHER OR NOT YOU'RE EMPLOYED.
11          A.    I AM EMPLOYED.
12          Q.    AND WHERE DO YOU WORK?
13          A.    AT UNIVERSAL CITY STUDIOS.
14          Q.    AND HOW LONG HAVE YOU BEEN WORKING THERE?
15          A.    32 YEARS.  IN DIFFERENT DEPARTMENTS.
16          Q.    AND WHAT DO YOU DO THERE?
17          A.    I'M IN FINANCE.
18          Q.    HAVE YOU EVER BEEN ACCUSED OF HARASSMENT?
19          A.    NO.  NOT UNTIL NOW, NO.
20          Q.    HAVE YOU EVER BEEN ACCUSED OF ANY CRIMINAL
21   BEHAVIOR?
22          A.    NO.
23          Q.    WERE YOU SERVED A REQUEST -- I MEAN --
24   SORRY.  WERE YOU SERVED A COPY OF THE REQUEST TO PLACE A
25   RESTRAINING ORDER AGAINST YOU?
26          A.    NO, I WAS NOT.
27          MS. BIRCHARD:  OBJECTION.  WE TRIED TO SERVE HIM.
28   THE SHERIFF'S OFFICE TRIED TO SERVE HIM.  BUT MR. TERHUNE
```

1   HAD LEFT HIS APARTMENT NUMBER OFF. AND HE LIVES IN A

2   GATED COMPLEX AND WORKS IN A GATED STUDIO. SO WE WERE

3   UNABLE TO SERVE HIM.

4        THE COURT: THANK YOU.

5           THE RELEVANCE OF HIS SERVICE IS NOT BEFORE

6   US SINCE HE APPEARED AND HE'S HERE AND YOU'RE GOING

7   FORWARD, COUNSEL. HE OBVIOUSLY HAD NOTICE.

8        MR. AMER: OKAY. YEAH.

9        Q.    WHEN DID YOU FIRST FIND OUT OR KNOW ABOUT

10  MISS KATIE BIRCHARD?

11       A.    A FRIEND OF MINE, STELLA GRACE, AND I HAD

12  JOINTLY PURCHASED A DISPLAY CASE AND FILLED IT WITH

13  VALENTINO MEMORABILIA FROM OUR COLLECTIONS AT HOLLYWOOD

14  HERITAGE MUSEUM. I'M A DOCENT THERE. ON ONE OF MY TIMES

15  AS A DOCENT, GEORGE KIEL, WHO RUNS THE BAR, HAD MENTIONED

16  TO ME A GIRL WHO RAN THE WEB SITE HAD COME AND COMPLAINED

17  ABOUT THE CASE. AND I HAD NEVER HEARD OF HER. AND SO I

18  WENT ONLINE. AND -- FROM WHAT HE SHOWED ME. AND THAT'S

19  HOW I FIRST BECAME AWARE OF HER. AND, YOU KNOW, I READ

20  HER BLOG.

21       MS. BIRCHARD: CAN I OBJECT TO THIS?

22       THE COURT: NO.

23         JUST A MINUTE. WHEN WAS THAT?

24      THE WITNESS: I BELIEVE THIS WAS SOMEWHERE IN

25  2008, AUGUST -- AFTER WE -- WE UNVEILED IT I THINK IN

26  AUGUST, 2008. SO IT WOULD BE SOMETIME THEREAFTER.

27      THE COURT: I DON'T MEAN TO SAY NO YOU CAN'T

28  OBJECT. YES, YOU CAN OBJECT. BUT WHAT IS YOUR

1   OBJECTION?

2        MS. BIRCHARD:  MY OBJECTION IS THAT THAT CAN'T BE

3   TRUE BECAUSE EVEN HIS OWN WRITING -- AND, ALSO, I NEVER

4   WROTE A ARTICLE LIKE THAT.

5        THE COURT:  OKAY.  THAT'S NOT A PROPER

6   OBJECTION.

7        MS. BIRCHARD:  I'M SORRY.  I'M NOT A LAWYER.

8        Q.    BY MR. AMER:  I'M SORRY.  YOU SAID THAT WAS

9   WHEN?

10       A.    IT HAD TO BE -- I DON'T KNOW THE EXACT

.11  DATE.  BUT SHE HAD POSTED PICTURES OF THE CONTENTS OF THE

12  EXHIBIT IN A -- AND SAID IT WAS RUBBISH AND NOT MUCH --

13       MS. BIRCHARD:  I OBJECT BECAUSE I DID NOT WRITE

14  THAT --

15       THE COURT:  OKAY.  THE OBJECTION'S OVERRULED.

16       THE WITNESS:  THAT WAS MY FIRST CONTACT.

17       Q.    BY MR. AMER:  I'M SORRY.  MY QUESTION WAS

18  AROUND WHAT TIME THAT WAS.

19       A.    IT WAS UNVEILED AT A PUBLIC EVENT IN

20  AUGUST, 2008.  SO I DON'T KNOW EXACTLY WHEN SHE SAW IT.

21       Q.    AND WERE THERE ANY SUBSEQUENT PUBLISHINGS

22  OR POSTING BY MISS BIRCHARD AGAINST YOU?

23       A.    YES.  SHE CONTINUED TO RAIL AGAINST MY

24  PROJECTS, MY BOOK.  SHE HAD A WHOLE THING WHY THE

25  VALENTINO MEMORIAL SUCKS.  THAT WAS THE HEADLINE.  AND I

26  BELIEVE IT'S STILL THERE.

27            I NEVER WROTE TO HER.  I NEVER COMPLAINED.

28  I NEVER DID ANYTHING.  BUT I WAS AWARE OF IT.

1       Q.    DID SHE DO -- DID SHE EVER WRITE OR POST

2  ANYTHING AGAINST YOU PERSONALLY?

3       A.    YES.  SHE --

4       MS. BIRCHARD:  I OBJECT.

5       THE COURT:  WHAT'S THE BASIS FOR YOUR OBJECTION?

6       MS. BIRCHARD:  BECAUSE WHAT DOES IT HAVE TO DO

7  WITH THE CASE?  IT SOUNDS LIKE THE DEFAMATION THING.

8       MR. AMER:  YOUR HONOR, SHE CLAIMS HE GOES ON HER

9  WEB SITE.

10      THE COURT:  OBJECTION OVERRULED.

11        GO AHEAD.

12     THE WITNESS:  REPEAT THE QUESTION.  I'M SORRY.

13     Q.    BY MR. AMER:  THE QUESTION WAS DID SHE EVER

14  WRITE OR PUBLISH ANYTHING AGAINST YOU?

15     A.    YES.  SHE HAD POSTED ON A WEB SITE SHE'S

16  REFERRED TO ALREADY, NIGHT -- I'M SORRY.  BACK UP.  ON

17  HER BLOG FORGETTHETALKIES.COM SHE HAD POSTED A VERY

18  NASTY, VINDICTIVE THING TOWARDS A FRIEND OF MINE, A

19  FELLOW VALENTINO COLLECTOR WHOSE NAME IS DONNA HILL --

20      MS. BIRCHARD:  I OBJECT BECAUSE THAT'S NOT TRUE.

21      THE BAILIFF:  YOU'RE NOT GOING TO INTERRUPT AGAIN.

22  LET HIM FINISH TALKING.

23      THE WITNESS:  I POSTED A DEFENSE OF DONNA SAYING

24  THAT HALA HAD DISTORTED THE FACTS, TOLD HALF-TRUTHS AND

25  SO FORTH.

26        THE NEXT DAY ON HER BLOG SHE NOW SAID NOT

27  ONLY THAT DONNA HILL, WHO SHE HAD ATTACKED THE DAY

28  BEFORE, NOW SHE SAID DONNA HILL AND TRACY TERHUNE WERE

1    CONSPIRING AGAINST HER.

2                   I'VE NEVER CONSPIRED AGAINST HER.  I'VE

3    NEVER MET HER.  EVEN TO THIS DAY I'VE NEVER MET HER OTHER

4    THAN HERE.

5          Q.    BY MR. AMNER:  AND CAN YOU JUST VERY

6    BRIEFLY TELL THE COURT WHAT -- OR HOW OFTEN MISS BIRCHARD

7    WOULD POST NEW THINGS ABOUT YOU.

8          A.    WELL, IT WAS -- SHE QUICKLY DEEMED ME "KING

9    OF THE KOOKIES" AND USED THAT TERMINOLOGY IN A DEROGATORY

10   WAY.  ANYTHING DEROGATORY SHE WOULD POST ABOUT ME.  SHE

11   CALLED ME EVIL.  SHE CALLED ME LOONY, DANGEROUS.  I HAD

12   NEVER MET HER.

13                  I HAD SO MANY PEOPLE INQUIRE, YOU KNOW, WHO

14   IS THIS PERSON SAYING ALL THIS ABOUT YOU.  AND TO

15   DATE -- TO THAT DATE I HAD NEVER CORRESPONDED WITH HER,

16   DID ANYTHING.

17                  SO SHE CONTINUED.  AND THEY WERE LIES, THEY

18   WERE JUST MADE UP, COMPLETELY FABRICATED ALLEGATIONS.

19   COMPLETELY FABRICATED.  I WAS STUNNED.

20         Q.    DO YOU HAVE ANY REASON --

21         A.    SHE DOESN'T LIKE THE VALENTINO MEMORIAL.

22   SHE EARLIER STATED IN HER TESTIMONY UP HERE THAT SHE MADE

23   A VERY SIMPLISTIC REVIEW OF MY BOOK.  BUT, ACTUALLY, IN

24   TRUTH, SHE CALLED IT -- AND I'M QUOTING -- TACKY AND

25   TRASHY --

26         MS. BIRCHARD:  I OBJECT BECAUSE THAT'S SERIOUSLY

27   NOT -- WHERE'S HIS PROOF OF THAT?

28         THE COURT:  YOUR OBJECTION'S OVERRULED.

1    Q.    BY MR. AMER:  AND WERE YOU THE ONLY PERSON

2  THAT MISS BIRCHARD SORT OF ATTACKED OR --

3    A.    NO.  IF YOU READ HER BLOG, IT'S PEPPERED

4  WITH PEOPLE THAT SHE HAS ATTACKED.  SHE ATTACKED A FELLOW

5  JOURNALIST, WHO I'M NOT FOND OF PERSONALLY --

6    THE COURT:  OKAY.  I'M GOING TO INTERRUPT HERE

7  BECAUSE THAT'S NOT RELEVANT.

8    THE WITNESS:  OKAY.

9    MR. AMER:  OKAY.

10    Q.    SO MR. TERHUNE, WHY DID YOU GO -- OR DID

11  YOU AT ANY TIME GO AND VISIT MISS BIRCHARD'S WEB SITES OR

12  BLOGS?

13    A.    I DID.  AND THE THING WAS FOR MY OWN LEGAL

14  PROTECTION I HAD TO VISIT IT OFTEN BECAUSE SHE WOULD

15  ALTER AND CHANGE AND DELETE AND MOVE THINGS AND ADD

16  THINGS AND --

17    MS. BIRCHARD:  I OBJECT BECAUSE THAT'S NOT TRUE.

18  THERE'S NO PROOF OF THAT.  WHERE'S YOUR PROOF?

19    THE COURT:  OKAY, YOUR OBJECTION'S OVERRULED.

20    I RULE ON WHETHER OR NOT THERE'S PROOF OF

21  SOMETHING.

22    Q.    BY MR. AMER:  MR. TERHUNE, SO YOU DID THAT

23  FOR YOUR OWN PROTECTION?

24    A.    I BEGAN TO PRINT OUT HER STATEMENTS ABOUT

25  ME ON HER BLOGS, HER POSTS, HER -- SO FORTH.  SO THAT'S

26  WHY I WOULD VISIT HER SITE, BECAUSE THEY CHANGED ALL THE

27  TIME.  I'D GO ONE DAY AND I WOULD READ IT TO SOMEONE AND

28  I WOULD SAY "OH MY GOD, THIS WASN'T EVEN HERE YESTERDAY."

1    Q.    DID YOU DO IT TO HARASS HER?

2    A.    NO.

3    Q.    DID YOU DO IT TO THREATEN HER?

4    A.    NO.

5    Q.    DID YOU DO IT IN ANY -- DID YOU HAVE ANY

6    INTENTIONS TO PERSONALLY HARM MISS BIRCHARD?

7    A.    ABSOLUTELY NOT.

8    Q.    HAVE YOU EVER -- BESIDES THE EMAIL THAT YOU

9    WROTE HER, HAVE YOU EVER HAD ANY CONTACT WITH HER?

10    A.    NO.

11    Q.    HAVE YOU EVER WENT TO HER HOUSE?

12    A.    NO.

13    Q.    HAVE YOU EVER APPROACHED HER IN ANY WAY,

14    SHAPE, OR FORM IN A THEATER OR ANY PUBLIC GATHERING?

15    A.    NO.

16    Q.    HAVE YOU EVER TOLD ANYBODY THAT YOU WANTED

17    TO HARM HER?

18    A.    NO.

19    Q.    NOW, ON THE EVENING OF FEBRUARY 3RD YOU

20    WENT TO THE MOVIE "FLAPPER"?   THE SCREENING OF THE MOVIE

21    "FLAPPER"?

22    A.    CORRECT.

23    Q.    DID YOU AT THAT TIME ATTEMPT TO TALK TO OR

24    IN ANY WAY HARASS MISS BIRCHARD?

25    A.    NO.

26    Q.    OKAY.

27          BY THE WAY, DID YOU KNOW THAT THAT EVENT

28    WAS PUT ON BY HER OR WAS BEING HEAVILY PROMOTED BY HER?

1        MS. BIRCHARD:  IT WASN'T PUT ON BY ME.  I JUST

2  WANT TO MAKE NOTE OF THAT.

3        MR. AMER:  I APOLOGIZE.

4        Q.    DID YOU KNOW THAT THAT SCREENING WAS

5  HEAVILY PROMOTED BY HER?

6        A.    NO.

7        Q.    WAS IT --

8        A.    SHE HAS A WEB SITE THAT SAYS "FLAPPERS."  I

9  DON'T LOOK AT THAT.  BUT I KNOW THAT SHE'S TRUTHFUL IN

10  WHAT SHE SAID ABOUT HAVING THAT SITE.  IF SHE PROMOTED

11  THERE, IT ESCAPED MY ATTENTION.

12        MS. BIRCHARD:  THAT'S --

13        Q.    BY MR. AMER:  SO, YOU DIDN'T GO THERE

14  BECAUSE YOU KNEW THAT SHE WOULD BE THERE OR -- WAS THAT

15  YOUR REASON FOR GOING?

16        A.    NO.  I WAS INVITED THERE.  AND I HAD NO

17  IDEA WHERE SHE WOULD ATTEND ANYTHING.  I HAD NO CLUE OF

18  THAT.

19        Q.    NOW, YOU'VE MENTIONED THAT SHE'S POSTED ALL

20  THESE THINGS ABOUT YOU.  DID YOU AT ANY TIME TRY TO

21  DIRECTLY CONTACT HER TO GET HER TO REMOVE THOSE

22  DEFAMATORY STATEMENTS ABOUT YOU?

23        A.    NO.

24        Q.    BUT YOU WROTE HER AN EMAIL; RIGHT?

25        A.    I DID SEND HER THE EMAIL THAT STATED "SINCE

26  WE'VE NEVER MET OR SPOKEN, PLEASE ALLOW ME TO INTRODUCE

27  MYSELF.  I'M THE PERSON YOU SLANDER ENDLESSLY ON YOUR

28  BLOGS" -- A PORTION SHE LEFT OUT WHEN SHE READ THAT

1     STATEMENT -- "AND PLEASE" -- I DIRECTED HER TO A WEB SITE

2     THAT -- I HAVE A WEB SITE THAT I HAD A PAGE UP "WHO IS

3     HALA PICKFORD?"

4               THAT'S ALL I DID. I DID NOT ATTACK HER

5     SISTER. I DID ATTACK HER OTHER THAN TO SAY "HERE'S WHAT

6     SHE SAID ABOUT ME OR MY PROJECTS AND HERE'S THE TRUTH."

7     THERE'S NOTHING THREATENING IN THERE AT ALL.

8         THE COURT: ARE YOU REFERRING TO THE EMAIL OF

9     12/25/09?

10        THE WITNESS: YES.

11        THE COURT: EXPLAIN TO ME WHEN YOU SAY "BY THE

12     WAY, IF YOU WANT ME TO MAIL YOU A COPY OF IT, I CAN

13     EASILY SEND IT TO 1141 SCREENLAND AVENUE, B, IN BURBANK

14     IF YOU'D LIKE," WHAT DOES THAT REFERENCE?

15        THE WITNESS: IN CASE SHE WANTED A PRINTOUT I

16     WOULD SEND IT TO HER THERE.

17        THE COURT: WHAT IS THAT ADDRESS?

18        THE WITNESS: THAT'S WHERE SHE LIVES.

19        THE COURT: HOW DO YOU KNOW THAT?

20        THE WITNESS: IT WAS ON 411.COM. IT'S PUBLIC

21     INFORMATION --

22        MS. BIRCHARD: I OBJECT BECAUSE THERE ISN'T A DATE

23     ON THAT. HE COULD HAVE JUST SUBMITTED THAT TO THAT WEB

24     SITE. THERE'S NO PROOF THAT THAT'S NOT SELF-SUBMITTED.

25        THE COURT: OBJECTION'S OVERRULED.

26        Q. BY MR. AMER: MR. TERHUNE, DOES MISS

27     BIRCHARD WRITE IN THE NAME OF KATIE BIRCHARD?

28        A. NO, SHE DOES NOT.

1    Q.    WHOSE NAME DOES SHE WRITE?

2    A.    SHE USES A FICTITIOUS NAME CALLED HALA

3    PICKFORD.  AND THAT'S WHY I -- I POSTED "WHO IS HALA

4    PICKFORD," AND I EXPLAINED THE LIES SHE SAID ABOUT ME.

5    Q.    NOW, YOU -- SHE CLAIMED THAT YOU SAID

6    SOMETHING ABOUT A SIZZLER.  HOW DO YOU KNOW THERE'S A

7    SIZZLER NEXT TO HER HOUSE?

8    A.    I WAS BORN IN BURBANK AND I LIVED JUST TWO

9    BLOCKS AWAY FROM THERE.  SO I'M VERY FAMILIAR WITH THE

10   AREA.  I LIVED ON HOLLYWOOD WAY.  AND I'VE EATEN THERE.

11   THE COURT:  ANYTHING ELSE, COUNSEL?

12   MR. AMER:  I THINK THAT'S IT, YOUR HONOR.

13   THE COURT:  CROSS-EXAMINATION.

14   MS. BIRCHARD:  OKAY.

15   THE COURT:  YOU HAVE FIVE MINUTES.

16   MS. BIRCHARD:  OKAY.

17

18                    **CROSS-EXAMINATION**

19   **BY MS. BIRCHARD:**

20   Q.    SO, IF YOU'RE NOT THREATENING ME, THEN WHY

21   DIG UP MY ADDRESS, WHY DIG UP MY LEGAL NAME?

22   A.    I'M SORRY.  CAN YOU REPEAT THAT --

23   Q.    IF YOU'RE NOT HARASSING ME OR THREATENING

24   ME, WHY DID YOU NEED MY LEGAL NAME, WHY DID YOU NEED MY

25   HOME ADDRESS, AND WHY DID YOU NEED TO MAKE ME AWARE YOU

26   HAD IT?

27   THE COURT:  THAT'S THREE QUESTIONS.  WHAT'S THE

28   FIRST QUESTION?

Q.    BY MS. BIRCHARD:  OKAY.  FIRST OFF, IF YOU
SAY THAT MY INFORMATION IS PUBLIC, THEN HOW DID YOU GET
MY LEGAL NAME?

A.    IT WAS ON THE ABSCAM -- I DON'T KNOW IF I'M
PRONOUNCING THAT RIGHT.  THE MUSIC WHERE YOU POSTED YOUR
SONGS.

Q.    HOW DID YOU GET TO THAT?  THAT'S HALA
KITTY.  THAT'S NOT HALA PICKFORD.  HOW DID YOU GET TO
THAT POINT?

A.    BECAUSE YOU HAVE A LOT OF BLOGS ON HALA
KITTY THAT REDIRECT.

Q.    NO, I DON'T --

THE COURT:  OKAY.  THAT'S THE QUESTION.  THERE'S
THE QUESTION; THERE'S THE ANSWER.

NEXT QUESTION.

Q.    BY MS. BIRCHARD:  OKAY.  THE QUESTION:  HOW
DID YOU GET FROM HALA PICKFORD TO HALA KITTY?

A.    WELL, LET ME TELL YOU.  FIRST OF ALL, YOU
MAKE IT SOUND LIKE I FOUND THAT OUT.  ACTUALLY --

Q.    I'M JUST ASKING --

BAILIFF:  YOU NEED TO LET HIM FINISH THE QUESTION.
OKAY?

THE WITNESS:  THERE IS A PERSON WHO BELONGS TO A
YAHOO WEB SITE THAT I AM ALSO OVERSEER OF; AND SHE -- SHE
WAS SO OFFENDED BY WHAT HALA HAD SAID ABOUT ME AND DONNA
HILL, WHO IS THE PERSON I WAS DEFENDING HER WHEN SHE
TURNED AROUND AND STARTED ATTACKING ME, THAT SHE
HERSELF -- SHE WORKS IN THE LIBRARY IN THE MIDWEST -- AND

```
 1    SHE PULLED THAT INFORMATION UP AND SAID, "HERE'S THIS
 2    GIRL, THIS IS WHO SHE REALLY IS."
 3              SHE GOT IT FROM YOUR -- YOU TIPPED IT OFF
 4    TODAY -- THE PAY PAL ACCOUNT.  SHE BOUGHT ONE OF YOUR
 5    BOOKS.  IT SAID BIRCHARD.  AND SHE WENT AND STARTED GOING
 6    FROM THERE AND SHE BACKTRACKED.  SHE FOUND IT AND
 7    PRESENTED IT TO ME.
 8              THE COURT:  NEXT QUESTION.
 9         Q.    BY MS. BIRCHARD:  SO WHY DID YOU SAY IT WAS
10    PUBLIC INFORMATION?
11              THE COURT:  NO, THAT'S NOT A PROPER QUESTION.  HE
12    ANSWERED THE QUESTION --
13         Q.    BY MS. BIRCHARD:  SO, DO YOU KNOW A MICHAEL
14    YAKENTOSS?
15         A.    IT'S MICHAEL -- YES, I DO.  YES.
16         Q.    BUT YOU NEVER HAD A DISCUSSION WITH MICHAEL
17    YAKENTOSS ABOUT ME?
18         A.    HE IS AWARE OF YOU, YES, BECAUSE YOU HAD
19    POSTED ONLINE A DVD THAT WAS COPYRIGHTED BY HIM AS A GIFT
20    TO HAND OUT AS A PRIZE AND HE OBJECTED TO THAT.
21              THE COURT:  THAT'S THE ANSWER.
22              NEXT QUESTION.
23         Q.    BY MS. BIRCHARD:  SO YOU DID NOT OBTAIN MY
24    HOME ADDRESS FROM MICHAEL YAKATAS?
25         A.    HE DID PROVIDE THAT AS WELL.
26         Q.    OKAY --
27              THE COURT:  NEXT QUESTION.
28         Q.    BY MS. BIRCHARD:  AND, I MEAN, IF YOU'RE
```

NOT THREATENING ME OR MY FAMILY, THEN HOW DID YOU FIND MY

SISTER'S NAME? CONVERSATIONS WITH RUDOLPH, IT WAS NOT

SHIPPED UNTIL MID DECEMBER. SO WHAT? YOU BOUGHT THAT

AND YOU'RE, LIKE, "ABBEY BIRCHARD." HOW DID YOU GET

ABBEY NICOLE BIRCHARD?

    A.    BECAUSE THE SAME PERSON IN THE MIDWEST WHO

IS INVESTIGATING YOU -- AND I MIGHT ADD I DID NOT REQUEST

HER TO DO THIS AND I WAS SURPRISED WHEN SHE PRESENTED ME

WITH THAT MATERIAL BUT NONE OF IT WAS OFFENSIVE. BUT

ANYWAYS, SHE, THROUGH FACEBOOK AND YOUR FRIENDS LIST,

FOUND YOUR SISTER THERE AND SAID "HERE SHE IS."

    Q.    MY -- OKAY. WELL, QUESTION. THEN WHY DID

YOU FEEL THAT WAS APPROPRIATE TO PUT ON A WEB SITE IN BIG

BOLD LETTERS A 14-YEAR-OLD'S NAME?

    THE COURT:  NO. NOT RELEVANT.

    NEXT QUESTION.

    Q.    BY MS. BIRCHARD: IF YOU'RE -- IF YOU -- IF

YOU FIRST BECAME AWARE OF ME THROUGH, AS YOU CLAIMED,

ABOUT AUGUST, 2008, FOR A BLOG I NEVER WROTE, WHY DID YOU

SAY IN AN EMAIL TO A MISS EVELYN ZEMAYA THAT YOU'VE BEEN

WATCHING ME FOR 2 YEARS?

    A.    WELL, WHEN WAS -- THAT EMAIL TO EVELYN WAS

WRITTEN A COUPLE MONTHS AGO. IT'S 2008. THIS IS 2010.

SO THAT'S 2 YEARS TO ME.

    Q.    I KNOW --

    A.    DID I SAY WATCHING YOU FOR 2 YEARS --

    Q.    I BELIEVE YOU DID --

    A.    CAN YOU QUOTE THAT TO ME, PLEASE, BECAUSE I

1  DON'T BELIEVE I USED THAT PHRASE.

2      Q.    "I HAD WATCHED FOR ALMOST 2 YEARS AS SHE

3  SMEARED THE VALENTINO MEMORIAL OVER AND OVER IN PRINT".

4      A.    BUT THAT WAS NOT WATCHING YOU PER SE IN A

5  STALKING WAY --

6      Q.    I'M ONLY ALLOWED TO ASK QUESTIONS --

7      A.    -- I WAS WATCHING WHAT YOU WERE WRITING

8  ABOUT MY PROJECTS, MY BOOKS.  AND THAT'S TRUE.

9      Q.    OKAY, THEN.  OKAY.  AND, SO, IF YOU'RE NOT,

10 YOU KNOW, HARASSING ME AND STALKING ME AND WHATNOT, THEN

11 WHY WOULD YOU SAY TO EVELYN, EVELYN WHO WROTE YOU JUST

12 LIKE A PARAGRAPH:  QUESTION, THAT -- LET'S SEE HERE.  I

13 WANT TO MAKE SURE I GET THE QUOTE RIGHT.  LET'S SEE.  YOU

14 HAVE TO GIVE ME A SECOND.  IT'S A BIT LONG.

15         OH.  "MY GOAL IN DOING THAT WAS ONLY TO LET

16 PEOPLE KNOW" -- "DOING THAT" REFERRING TO HIS POST ON THE

17 WEB SITE -- "WAS ONLY TO LET PEOPLE KNOW THIS IS A

18 DISTURBED GIRL AND SHE HAS LATCHED ONTO RUDOLPH VALENTINO

19 AS HER DRUG OF CHOICE FOR THE MOMENT.  SHE COMES IN,

20 PICKS OUT" --

21         THE COURT:  YOU'RE TALKING TOO FAST.

22         MS. BIRCHARD:  I'M SORRY.  I'LL JUST START FROM

23 THE BEGINNING.

24      Q.    "MY GOAL IN DOING THAT WAS ONLY TO LET

25 PEOPLE KNOW THIS IS A DISTURBED GIRL AND SHE IS -- WHO

26 HAS LATCHED ONTO RUDOLPH VALENTINO AS HER DRUG OF CHOICE

27 FOR THE MOMENT.  SHE COMES IN, PICKS OUT KEY PEOPLE IN

28 THE PARTICULAR FILM -- IN THIS CASE VALENTINO -- AND

BEGINS TO SLING MUD, BLATANTLY FALSE AND MALICIOUS
INSINUATIONS." AND IT JUST KIND OF GOES ON FROM THERE.

        SO WHY WOULD YOU BE TELLING PEOPLE WHO
ASKED YOU ONE PARAGRAPH THIS IF YOU NOT OBSESSED WITH ME
AND JUST ARE CONSTANTLY "GOT TO GET RID OF THIS HALA
GIRL"?

        A.    FIRST -- A COUPLE OF THINGS. FIRST, I
NEVER SAID, "WE HAVE TO GET RID OF THIS HALA GIRL" --

        Q.    GENERALIZING THERE.

        A.    WELL, YOU PUT THAT OUT THERE. AND I NEVER
SAID THAT. I HAVE NEVER, EVER ONCE SPOKEN AGAINST YOUR
PROJECTS --

        Q.    YES, YOU HAVE. YOU SAID I STEAL MONEY --

        A.    NO, I HAVEN'T --

    THE COURT: MISS TERHUNE -- I BEG YOUR PARDON.

    THE WITNESS: TO ANSWER YOUR QUESTION WHY I
RESPONDED TO EVELYN WHERE SHE ASKED ME AND IF -- HER
LETTER, WHICH I DON'T HAVE IN FRONT OF ME TO READ, BUT IT
SAID SOMETHING TO THE EFFECT OF I WAS THINKING OF DOING
AN ARTICLE ON HALA AND SOMEBODY POINTED ME TO YOUR SITE.
SHE MADE IT SOUND LIKE SHE HAD SECOND THOUGHTS IN REGARDS
TO CONNECTING WITH YOU.

        I BELIEVED HER AT FACE VALUE AND I WANTED
TO LET HER KNOW IF -- SHE NEEDS TO KNOW THE FACTS OF WHAT
YOU'VE DONE TO ME, TO THE PROJECTS AND SO FORTH. NONE OF
THAT WAS EVER SAYING I WOULD THREATEN YOU, STALK YOU, OR
DO ANYTHING TO YOU.

        Q.    NOT --

1       A.    I --

2       Q.    WELL, MY QUESTION IS --

3       A.    THEN SHE FOLLOWED UP WITH A LETTER BACK

4 SAYING "WHAT THREAT DOES SHE POSE TO YOU?"

5              AND I CEASED ALL COMMUNICATION WITH HER

6 BECAUSE I COULD SEE SHE WAS -- SHE WASN'T WHAT SHE

7 APPEARED TO BE.

8       Q.    WELL, THAT'S NOT RELEVANT HERE.  I GUESS I

9 COULD, BUT I WON'T.

10            AND IF YOU'RE NOT A THREAT TO ME, THEN WHY

11 DID YOU TELL A MR. DAVID -- DAVID GASTON THAT YOU HAD --

12 THERE'S WAS AN ANTI-HALA COALITION AND YOU FELT SORRY FOR

13 ME OVER IT, THERE WERE PEOPLE WHO WANTED HER TO QUIT

14 WRITING AND THEY'D SEE TO IT.  THIS WAS ON CHRISTMAS DAY.

15      A.    I HAD SEVERAL HOURS OF CONVERSATION WHICH

16 HE CALLED ME AND SAID HE WAS CALLING AS A INTERCESSORY ON

17 YOUR BEHALF.  AND I SAID, "IF SHE'LL TAKE EVERYTHING DOWN

18 ABOUT ME I'LL TAKE THE ONE PAGE DOWN ABOUT HER."

19            AND ALL MY PAGES ARE "WHO IS HALA?"  I

20 NEVER CALLED HER NAMES OTHER THAN --

21     MS. BIRCHARD:  OBJECTION.  IT DIDN'T ANSWER THE

22 QUESTION.

23     THE WITNESS:  REPEAT THE QUESTION PLEASE.

24     THE COURT:  YEAH.  REPEAT THE QUESTION.

25      Q.    BY MS. BIRCHARD:  MY QUESTION WAS IF YOU'RE

26 NOT A THREAT TO ME AND IF YOU'RE NOT OBSESSED WITH ME,

27 WHY WOULD YOU TELL MR. DAVID GASTON ON THE PHONE THERE'S

28 A ANTI-HALA COALITION AND YOU FELT SORRY FOR ME OVER IT?

1          YOU DIDN'T NECESSARILY SAY YOU WERE

2 INVOLVED; BUT YOU KNEW A LOT ABOUT IT.

3          A.    NO.   I MADE IT CLEAR TO DAVID THAT I WAS

4 NOT PART OF ANYTHING.   AND I DID NOT CALL IT A "ANTI-HALA

5 COALITION."   I SAID --

6          MR. AMER:   OBJECTION.   SHE'S NOT LETTING HIM

7 FINISH THE ANSWER.

8          Q.     BY MS. BIRCHARD:   I'M SORRY.   FINISH.

9          A.     I TOLD HIM THERE WERE DARKER FORCES AGAINST

10 YOU AS FAR AS IN THE VALENTINO COMMUNITY THAN ME AND I

11 HAD NOTHING AGAINST YOU.   AND I TOLD HIM AND IT WAS IN

12 THE EMAIL THAT I PLANNED TO BUY YOUR BOOK.   DOES THAT

13 SOUND LIKE I'M AGAINST YOU?

14          Q.     SO WHY DO YOU FEEL, I GUESS, THAT THE THREE

15 ARTICLES YOU PUT UP GIVING MY PERSONAL INFORMATION -- WHY

16 DO YOU FEEL IT WAS RELEVANT AND JUSTIFIED IF I WAS REALLY

17 THIS HORRIBLE, DEFAMING MONSTER, THAT IT'S A-OKAY TO PUT

18 UP MY FULL LEGAL NAME, MY SISTER'S FULL LEGAL NAME, MY

19 USER NAMES ON FORUMS THAT HAVE NOTHING TO DO WITH SILENT

20 FILM OR YOURSELF OR DONNA OR ANYONE?   WHY WOULD YOU --

21 WHY WAS THAT OKAY I GUESS IS MY QUESTION --

22          A.     FIRST OF ALL, THE NAME OF THE PAGE WAS "WHO

23 IS HALA PICKFORD?"

24          THERE IS NO HALA PICKFORD.   YOU ARE NOT

25 HALA PICKFORD.   YOU ARE KATIE LYNN BIRCHARD.   SO THE

26 ARTICLE WAS "WHO IS HALA PICKFORD?"

27          "KAITLIN BIRCHARD."

28          FOR THE FIRST TIME, YOU WERE ATTACKING

1  PEOPLE, INCLUDING MYSELF, IN PRINT AND HIDING BEHIND A

2  FICTITIOUS NAME. I KEPT GETTING EMAILS "WHO IS THIS GIRL

3  THAT'S SAYING THIS ABOUT YOU? SHE'S TAKING ON CINECON,

4  SHE'S GOING AFTER THIS PERSON." ALL I DID BY USING YOUR

5  OTHER ALIASES THAT YOU HID THEM, HALA KAMORA, HALA

6  KITTY --

7

8          (MULTIPLE PEOPLE SPEAKING SIMULTANEOUSLY.)

9

10          THE WITNESS: -- THAT WAS MY REASON TO SAY THE

11  NAME OF THE ARTICLE, "WHO IS HALA PICKFORD?"

12          THERE IS NO HALA PICKFORD.

13          Q.     BY MS. BIRCHARD: I WOULD JUST LIKE TO

14  POINT OUT RUDY VALENTINO WAS NOT RUDY VALENTINO. BUT --

15

16          (MULTIPLE PEOPLE SPEAKING SIMULTANEOUSLY.)

17

18          THE BAILIFF: YOU GUYS NEED TO LET THE COURT

19  REPORTER TAKE ONE PERSON AT A TIME. DO NOT TALK OVER

20  EACH OTHER AGAIN.

21          MS. BIRCHARD: MY APOLOGIES.

22          Q.     IF THIS IS THE CASE THERE'S JUST THIS HALA,

23  WHY PUT IT UP THERE? WHY IS THAT STILL RIGHT? WHY IS IT

24  RIGHT TO PUT ME AND MY SISTER'S FULL LEGAL NAME IN ALL

25  THAT?

26          A.     PUTTING YOUR SISTER'S NAME -- ALL IT SAID

27  IS ABBEY BIRCHARD --

28          Q.     NO. IT SAID ABBEY NICOLE BIRCHARD --

1   A.     ABBEY NICOLE BIRCHARD SAID HALA KITTY

2   WAS -- WENT BY HALA NOW.  SHE GOES BY HALA NOW.  BUT YOU

3   NEVER DID THAT.  YOU TURNED AROUND AND SAID I ATTACKED

4   YOUR 14-YEAR-OLD SISTER.  I DIDN'T KNOW HER AGE UNTIL YOU

5   ANNOUNCED IT ONLINE.  THERE WAS NO INTENT TO ATTACK YOUR

6   SISTER.  THERE IS STILL NO INTENT.  THERE WAS NO INTENT

7   TO ATTACK YOU.

8   Q.     MY QUESTION IS IF THERE WAS NO ATTEMPT TO

9   ATTACK MY SISTER OR MYSELF THEN WHY PUT IT THERE?  WHY

10  NOT SAY --

11  A.     I DID.  I TOOK IT DOWN WITHIN A SHORT TIME.

12  ACTUALLY, THE WHOLE PAGE WAS UP THERE PROBABLY A TOTAL OF

13  NO MORE THAN TWO WEEKS --

14  Q.     ACTUALLY, I OBJECT TO THAT BECAUSE YOU --

15  YOU LOOKED IT UP ABOUT -- YOU TOOK IT DOWN WHEN DAVID

16  REQUESTED IT.  BUT THEN YOU PUT IT BACK UP IN A NEW FORM

17  AND KEPT IT UP IN ITS THREE FORUMS FOR ABOUT A MONTH.

18  THE COURT:  LAST QUESTION.

19  MS. BIRCHARD:  LAST QUESTION, YOUR HONOR.

20  Q.     I MEAN, I GUESS MY LAST QUESTION IS WHY DO

21  YOU FEEL IT'S A APPROPRIATE FOR A 52-YEAR-OLD MAN TO GO

22  AND PUT ALL THIS STUFF ABOUT A 22-YEAR-OLD --

23  MR. AMER:  OBJECTION, YOUR HONOR.

24  THE COURT:  LET HER FINISH HER QUESTION.

25  Q.     BY MS. BIRCHARD:  -- A 22-YEAR-OLD GIRL

26  ONLINE?  I MEAN, JUST WHY DO YOU FEEL THAT THAT'S

27  APPROPRIATE?  I JUST DON'T UNDERSTAND.

28  A.     BECAUSE YOU -- ALL I DID IS PUT YOUR NAME